## CORSICANA NATIONAL BANK OF CORSICANA *v.* JOHNSON.

### ERROR TO THE CIRCUIT COURT OF APPEALS FOR THE FIFTH CIRCUIT.

No. 23. Argued January 16, 1919.—Decided December 8, 1919.

A loan made by a national bank to two persons jointly, or in form one half to each but in substance as a single loan, violates the National Bank Act if in excess of the limit set by Rev. Stats., § 5200; and, in a complaint filed by the bank to recover resulting damages from a director under § 5239, a designation of the borrowers as a firm is descriptive merely and not essential. P. 80.

There was substantial evidence in this case from which the jury might find that there was a single, excessive loan to two persons, in making which defendant as a director of the plaintiff bank knowingly participated, rather than two loans, neither of them excessive, made to the borrowers severally. *Id.*

Contingent liabilities incurred by one person avowedly and in fact as surety or as indorser for money borrowed by another are not "liabilities . . . for money borrowed" in the sense of Rev. Stats., § 5200. P. 82. *Cochran* v. *United States*, 157 U. S. 286; Rev. Stats., § 5211, distinguished.

And where the surety signs ostensibly as joint maker, a director who knew and relied upon his suretyship is entitled to prove it when sued under § 5239 for participating in the making of an alleged excessive loan. P. 83.

A director's liability for knowingly participating in the making of a loan in excess of the limit prescribed by Rev. Stats., § 5200, is not affected by the supposed standing of the borrowers, the propriety of his motive, the continued prosperity of the bank, its failure to sue other officers or directors, or to sue him until after a change in the stockholding interest or control, or by the fact that incoming stockholders purchased their shares with knowledge of the loan and of his alleged liability and may profit by a recovery against him. *Id.*

An action in Texas by a national bank against a former director, under Rev. Stats., § 5239, for damages resulting from an excessive loan,

is not barred in two years, but in four. Vernon's Sayles' Civ. Stats., 1914, Arts. 5687, 5690. P. 85.

The liability imposed upon the director under Rev. Stats., § 5239, is direct, not contingent or collateral; the cause of action and the damages are complete when the money is loaned, and, while the damages may be diminished by what the bank collects from the borrowers, it is not obliged to proceed primarily against them. P. 86.

The excessive loan being unlawful *in toto*, the bank's damage in such cases is not measured by the part in excess of what might have been lent lawfully, but by the whole amount plus interest and less salvage. P. 87.

When a director and vice president of a national bank makes an excessive loan, and, afterwards, knowing the borrowers to have become insolvent, joins in causing their paper to be transferred for full consideration but "without recourse" from the bank to a loan corporation, closely affiliated with the bank and having identical officers, directors and shareholders with ratable distribution of shares, the transaction, not having been ratified or acquiesced in by the shareholders, is subject to rescission by the loan company through resolution of a majority in interest at a regular shareholders' meeting, followed by appropriate action of its directors and officers; and an acquiescence in such rescission upon the part of the bank, through its shareholders, directors and officers, is not to be regarded as a voluntary reacceptance of the paper in such a sense that the damages resulting from nonpayment of the loan must be treated, in an action against the director under Rev. Stats., § 5239, as flowing from such voluntary action and not from the unlawful loan itself. P. 88.

In such a case, although the two corporations are distinct in so far that a loss on the paper to the loan company would not be the same in law as a loss to the bank, the shareholders nevertheless have a right to consider the practical effect of the transfer upon their common interest and to be guided by that interest in determining whether and upon what terms to rescind the transfer. P. 89.

Since the transfer would operate only provisionally to satisfy the damages to the bank from the excessive loan, the rescission leaves the director liable for the damages in full; nor is it open to him to object that the rescission was brought about for the purpose of holding him so liable, through changes in the boards of directors involving the introduction of figureheads or "dummies," nor to criticise the terms of the re-transfer agreed to by the two corporations. P. 93.

Reversed.

THE case is stated in the opinion.

*Mr. Joseph Manson McCormick,* with whom *Mr. Richard Mays* and *Mr. Francis Marion Etheridge* were on the brief, for plaintiff in error.

*Mr. Cullen F. Thomas, Mr. W. J. McKie* and *Mr. Henry C. Coke,* for defendant in error, submitted.

MR. JUSTICE PITNEY delivered the opinion of the court.

This was an action brought under § 5239, Rev. Stats., in the then Circuit now District Court of the United States for the Northern District of Texas by plaintiff in error, a national banking association which we may call for convenience the Bank, against defendant in error, formerly a member of its board of directors and its vice president, to hold him liable personally for damages sustained by the Bank in consequence of his having knowingly violated, as was alleged, the provisions of § 5200, Rev. Stats., as amended June 22, 1906, c. 3516, 34 Stat. 451, by participating as such director and vice president in a loan of the Bank's funds to an amount exceeding one-tenth of its paid-in capital and surplus.

The action appears to have been commenced in February, 1910, and, after delays not necessary to be recounted, was tried before the District Court with a jury. A verdict was directed in favor of defendant, and the judgment thereon was affirmed by the Circuit Court of Appeals, no opinion being delivered in either court. The judgment of affirmance is now under review.

The amended § 5200, Rev. Stats., as it stood at the time the alleged cause of action arose, reads as follows, the matter inserted by the amendment being indicated by brackets:

"Sec. 5200. The total liabilities to any association, of any person, or of any company, corporation, or firm for money borrowed, including in the liabilities of a company

or firm the liabilities of the several members thereof, shall at no time exceed one-tenth part of the amount of the capital stock of such associations, actually paid in [and unimpaired and one-tenth part of its unimpaired surplus fund; *Provided, however,* That the total of such liabilities shall in no event exceed thirty per centum of the capital stock of the association]. But the discount of bills of exchange drawn in good faith against actually existing values, and the discount of commercial or business paper actually owned by the person negotiating the same shall not be considered as money borrowed."

The pertinent portion of the other section reads as follows:

"Sec. 5239. If the directors of any national banking association shall knowingly violate, or knowingly permit any of the officers, agents, or servants of the association to violate any of the provisions of this Title, all the rights, privileges, and franchises of the association shall be thereby forfeited. . . . And in cases of such violation, every director who participated in or assented to the same shall be held liable in his personal and individual capacity for all damages which the association, its shareholders, or any other person, shall have sustained in consequence of such violation."

Under the rule settled by familiar decisions of this court, in order for the Bank to prevail in this action it must appear not only that the liabilities of a person, company, firm, etc., to the Bank for money borrowed were permitted to exceed the prescribed limit, but that defendant, while a director, participated in or assented to the excessive loan or loans not through mere negligence but knowingly and in effect intentionally, *Yates v. Jones National Bank*, 206 U. S. 158, 180; with this qualification, that if he deliberately refrained from investigating that which it was his duty to investigate, any resulting violation of the statute must be regarded as "in effect inten-

tional," *Thomas* v. *Taylor*, 224 U. S. 73, 82; *Jones National Bank* v. *Yates*, 240 U. S. 541, 555.

The facts are involved, and need to be fully stated. And necessarily, in order to test the propriety of the peremptory instruction given by the trial judge, we must bring into view the facts and the reasonable inferences which tended to a different conclusion, and where the evidence was in substantial dispute must adopt a view of it favorable to plaintiff; but of course we do this without intending to intimate what view the jury ought to have taken, had the case been submitted to it.

On June 10, 1907, plaintiff, whose banking house was at Corsicana, Texas, had $100,000 capital and $100,000 surplus, aggregating $200,000, and making $20,000 the applicable limit under § 5200. Defendant was a director and vice president of the Bank, active—perhaps dominant—in the conduct of its banking business, and familiar with the state of its finances.

The averment of a breach of duty relates to an alleged excessive loan or loans made on or about the date last mentioned to Fred Fleming and D. A. Templeton, who for a considerable time had been engaged in business as private bankers in Corsicana and in several other towns in Texas under the firm name of Fleming & Templeton, and also had conducted at Corsicana a branch bank for the Western Bank & Trust Company, a state institution of which Fleming was president and Templeton vice president and whose main banking house appears to have been at Dallas, about 50 miles from Corsicana. There was evidence that early in June, 1907, Fleming & Templeton terminated their private banking business at Corsicana and turned over their deposit accounts—between $30,000 and $40,000—to the Corsicana National Bank, plaintiff herein, together with money or exchange on the Western Bank & Trust Company sufficient to meet them. Whether the firm was in fact dissolved at that time or later, and

whether the dissolution applied to their other branches, or to the Corsicana business only, were points concerning which under the evidence there was some doubt.

On or about June 10th, while the president of the Bank was absent on vacation, defendant loaned for the Bank to Fleming and Templeton $30,000 (less discount) upon two promissory notes for $15,000 each, maturing in six months. Defendant testified that both Fleming and Templeton negotiated with him, asking for two separate loans of $15,000 each, telling him that they had dissolved partnership and were winding up and closing out at Corsicana, and would turn over between $30,000 and $40,000 of deposits to the Corsicana National Bank. He further testified: "One of the considerations of this loan was the transfer of the deposits and with it the accounts of Fleming & Templeton." He insisted that two separate loans were made, of $15,000 each, one to Fleming for which Templeton was surety, the other to Templeton for which Fleming was surety. But defendant's own account of the circumstances under which and the special inducement upon which the loan was made, with other evidence to be recited below, left room for a reasonable inference that there was in fact but a single loan, and that separate notes were taken in order to avoid the appearance of a loan in excess of the limit. They were in the usual form of joint and several notes, payable to plaintiff's order. One was signed "Fred Fleming, D. A. Templeton," the other "D. A. Templeton, Fred Fleming," without naming either maker as surety. Discount to the amount of $900 was deducted, and the net proceeds, $29,100, were paid by a draft drawn by the Bank on the Western Bank & Trust Company to the order of "Fleming & Templeton," which was sent by mail inclosed in a letter written upon the Bank's letter-head, dated June 10, 1907, and addressed to Templeton at Dallas, in which letter, after acknowledging receipt of the two notes for $15,000 each, "signed by

yourself and Fred Fleming," it was stated: "We have deducted the discount, $900.00, and hand you herewith our draft #A, 7830, on Western Bank & Trust Co., order Fleming & Templeton, for $29,100.00." The retained copy of this letter appears to have been introduced in evidence; at the foot, opposite the place of signature, are the initials "V. P." With regard to this, as also to certain other "V. P." letters dated in the following December and relating to renewal of the notes, defendant testified: "I think I signed the letters which are offered in evidence as Exhibits H," etc.

There was evidence that the draft for $29,100 was indorsed in the firm name by Templeton and deposited in the Western Bank & Trust Company at Dallas to the credit of the joint account of Fleming & Templeton, to make up in part an overdraft amounting to more than $125,000; this account having been overdrawn constantly, and in large but varying amounts, since the preceding April.

As a result of an examination of the Bank made a few days later, the Comptroller of the Currency wrote to its president under date June 22, severely criticising the Fleming-Templeton loan, among others, as excessive under § 5200, Rev. Stats., and saying: "Immediate arrangements must be made to reduce these loans to the legal limit." It was a fair inference that defendant knew of this letter, or in the proper performance of his duties would have known of it. Whether any reply was made to it did not appear.

Notwithstanding the warning thus given, when the notes matured in December they were renewed with defendant's assent for a further period of six months, joint notes being given to the Bank as before, and the further sum of $900 being paid by Fleming & Templeton to the Bank for interest in this way: plaintiff, under defendant's direction, charged the amount in a single

item to the Western Bank & Trust Co., for account of the borrowers, and the latter institution acknowledged the charge, gave credit to plaintiff for the amount, and charged it against the joint account of Fleming & Templeton. During December some correspondence passed between defendant at Corsicana, he writing as vice president of the Bank, and Templeton at Dallas, relating to the renewal of the notes, tending to show that they were regarded by both writers as representing a single obligation of "Fleming & Templeton." Thus, Templeton on December 3d wrote to defendant: "Referring to the notes of Fleming & Templeton," etc.; and defendant wrote to him on the following day mentioning "renewal notes of loan to you and Mr. Fleming."

The evidence tended to show that up to the time of the renewal the borrowers were apparently solvent, but that about January 15, 1908, they became manifestly and notoriously insolvent. The Western Bank & Trust Company closed its doors on that date and went into liquidation, with Fleming and Templeton owing it several hundred thousand dollars. About the same time Fleming and perhaps Templeton went into bankruptcy, and Templeton afterwards died, and their respective estates paid small dividends upon their obligations. The jury would have been warranted in finding that it was evident to defendant, as a banker, on and after the 15th of January, that there would be a substantial loss upon the Fleming and Templeton notes.

On February 6, 1908, an official bank examiner visited the Bank, with the result that on the 26th the Deputy Comptroller wrote calling the attention of its officers to alleged repeated violations of the national banking law in the conduct of its affairs, specifying certain loans in excess of the limit prescribed by § 5200, among them "Fleming & Templeton, $30,000," and stating that "the directors who are responsible for the loans or permitted

them to be made should assume liability for any loss that may be sustained thereon and not throw the burden of such loss on innocent stockholders." On March 11 the directors, including defendant, united in signing a letter to the Comptroller in reply to his criticisms, among other things saying: "Reference to the Fleming & Templeton item of $30,000 we beg to say that this item has been disposed of by the Bank and they now owe us nothing." It was a reasonable inference that defendant intended to admit that it was a single loan and in excess of the limit.

In explanation of the statement that it had been "disposed of by the Bank," the evidence tended to show that on February 12, 1908, nearly a month after the insolvency of Fleming and Templeton had become notorious and a few days after the bank examiner's visit, defendant and the president of the Bank caused the two notes of December 10 to be transferred "without recourse" to an affiliated corporation known as the Corsicana National Land & Loan Company (they being directors and officers of this corporation also), upon payment of $29,400, the full face value less discount, as consideration; the payment being made by a transfer of credit upon the books of the Bank. Defendant relies upon this as wholly relieving the Bank from loss by reason of the loan, and consequently as releasing him from responsibility to the Bank. But the evidence tended to show further that the loan company in January, 1910, shortly before this suit was brought, rescinded the transaction upon the ground of fraud, and that there was a settlement as between the loan company and the Bank based upon an acknowledgment by the latter of the former's right to rescind.

A brief account of the relations between these two corporations, and of their dealings respecting the notes in question, becomes material. The loan company was organized in the month of May, 1907, under the laws of the State of Texas, with $50,000 capital stock and with

stockholders and directors identical with those of the Bank. The capital of the company was subscribed for and paid out of a special dividend declared by the directors of the Bank for the purpose, and each stockholder had the same proportion of stock in the company as in the Bank. The purpose of the new corporation, as declared in its charter, was the "accumulation and loan of money." Defendant testified: "The purpose of the loan company, a state corporation, was to take such paper as the bank could not handle. It was organized by the stockholders of the bank and paid for out of the earnings of our bank. . . . The loans of the loan company were largely real estate loans. It was to help out the bank in every possible [way]." From the organization of the company in the spring of 1907 until the spring of 1909, defendant was a director and active in the management of the company as well as of the Bank. He testified that the stockholders of the two corporations were identical, and continued to be so during the entire period just mentioned; that "whenever there was a sale of bank stock, it carried with it that particular shareholder's stock in the loan company." During the same period the two corporations had the same president, vice president, and directors, while the assistant cashier of the Bank was secretary of the loan company.

So far as appeared, the transfer of the Fleming and Templeton notes to the loan company, and the payment made by the company to the Bank, were never expressly authorized or ratified by the stockholders of either corporation; nor did it appear that the stockholders of the loan company ever authorized its directors to employ its funds in taking bad or doubtful paper off the hands of the Bank at a loss; much less, to relieve the directors of the Bank from responsibility for its losses.

In April or May, 1909, there was a change in the control of the Bank due to sales of a majority of the stock followed

by a change of officers, defendant retiring as both stock-
holder and director. The corresponding shares of the
stock of the loan company were transferred at the same
time, and the new management officered the company as
well as the Bank. So far as appeared from the evidence,
the transfer of defendant's stock carried with it no agree-
ment that he should not be held responsible to the Bank
because of the Fleming and Templeton loan, nor any
approval of the transfer of the loan to the loan com-
pany.

The Bank and the loan company held annual meetings of
stockholders on January 11, 1910, at which, for the first
time so far as appears, the boards of directors were so
selected that a majority of one board no longer were
directors of the other corporation. This was done by
electing, as five out of nine directors of the loan company,
individuals holding one share of stock each, recently
placed in their names for the purpose of qualifying them.
They were not stockholders of the Bank; but, except for
them, the stockholders of the two corporations still were
the same, and it was a reasonable inference that the
two meetings were attended by the same individuals.
Minutes of these stockholders' meetings, and of certain
meetings of the respective boards of directors, were intro-
duced in evidence and supplemented by other testimony,
from all of which the following additional corporate
proceedings appeared. The stockholders of the loan
company, more than a majority in interest being present,
unanimously adopted a resolution reciting the taking of
the notes of December 10, 1907, by the Bank from Flem-
ing and Templeton, and that on or about January 15,
1908, the makers became insolvent and the notes worth-
less and uncollectible; and setting forth that, with knowl-
edge of this fact, certain of the directors and officers of the
Bank illegally and wrongfully transferred the notes to the
loan company, for which the same officers and directors,

being likewise officers and directors of the loan company, illegally and wrongfully transferred to the Bank out of the funds of the loan company the face value of the notes, whereby the Bank had committed a wrong upon the loan company and was liable to it therefor; and by this resolution the directors of the company were authorized to adjust and settle this demand against the Bank and to tender and return to the Bank the Fleming and Templeton notes and indebtedness with any collateral security held for them. The directors of the loan company thereafter and on the same day passed a resolution to the like effect, and appointed a committee to make demand upon the Bank for return of the money wrongfully transferred to the Bank for the notes and to adjust and settle this demand; the notes and indebtedness of Fleming and Templeton and any collateral security held therefor being at the same time tendered and ordered to be returned to the Bank. This committee appeared before the stockholders' meeting of the Bank and formally presented the demand, whereupon these stockholders authorized their board of directors to act upon the claim made on the Bank by the loan company and to adjust and settle it if they should conclude that the Bank was liable to the loan company, otherwise to reject it. A few days later a meeting of the new board of directors of the Bank was held, at which a communication from the loan company committee was presented, in substance the same as that previously presented to the Bank stockholders, and the resolution of the Bank stockholders thereon was read; and thereupon the directors authorized the president of the Bank, if he believed the claim of the loan company to be just, to proceed to settle it in such a way as he might deem to be to the best interest of the Bank. Under this authority, the president of the Bank communicated to the loan company committee in substance that the Bank recognized the legality and justness of the claim of the loan company and

would pay it provided the company would purchase from the Bank a certain cotton mill property for the sum of $65,000, accept $30,000 of this in payment of its demand against the Bank, transfer to the Bank the Fleming and Templeton notes and indebtedness, with all collateral securing the same, and execute to the Bank its own promissory note for the remaining $35,000, with the cotton mill property as security. This was agreed to by the directors of the loan company, and the settlement was carried out accordingly. Shortly after this, the present action was brought.

The "collateral security" above referred to appears to have consisted of certain shares of stock in a corporation known as the Fleming Ranch & Cattle Company, acquired in the winding-up of the bankrupt estate of Fleming. These shares, so far as the evidence showed, were the only thing of value recovered either by the loan company or by the Bank from the estates of the borrowers. After the present suit was commenced, the Fleming Ranch & Cattle Company was liquidated, and in the distribution of its assets the Bank received sums aggregating $9,149.34, which are credited as payments on account of its claim against defendant.

So far as the above-recited facts were in dispute, there was substantial evidence tending to support a view of them favorable to plaintiff's contentions. What weight should be given to it was for the jury, not the court, to determine. *Hepburn* v. *Dubois*, 12 Pet. 345, 376; *Lancaster* v. *Collins*, 115 U. S. 222, 225; *Chicago & Northwestern Ry. Co.* v. *Ohle*, 117 U. S. 123, 129; *Ætna Life Ins. Co.* v. *Ward*, 140 U. S. 76, 91; *Troxell* v. *Delaware, Lackawanna & Western R. R. Co.*, 227 U. S. 434, 444.

We proceed to consider, in the order of convenience, the questions raised upon the record.

(1) And first, as to the direction of a verdict in favor of defendant. Plaintiff, in the amended petition upon which

the case went to trial, after a circumstantial statement respecting the transaction of June 10, 1907, alleged that the discount of the notes "was an excessive loan, whether regarded as one loan to the firm of Fleming & Templeton, as plaintiff alleges the fact to be, or regarded as two loans, as contended for by the defendant in his pleadings heretofore filed herein." The designation of Fleming & Templeton as a "firm" is but descriptive and not essential, and the pleading is sufficient if the proof tended to show a single and excessive loan made to them jointly in any capacity, or made in form one-half to each but in substance as a single loan.

In our opinion, the trial judge clearly erred in holding, as in effect he must have held, that there was no substantial evidence from which the jury might find that there was an excessive loan in the making of which defendant, as a director of the Bank, knowingly participated. That he acted for the Bank in the matter, and that he knew that any loan in excess of $20,000 was prohibited, he admitted. His denial that it was a single loan, or that he knew it to be such, is not conclusive; there being substantial evidence inconsistent with it, tending to show facts and circumstances attendant upon the transaction, of which he had knowledge, and also subsequent conduct in the nature of admissions by him, inconsistent with his testimony upon this point. The account of the negotiations, as given in defendant's own testimony; the fact that he knew that the firm of Fleming & Templeton, even if dissolved, was still in liquidation; that one of the inducements for the loan (or "loans") was the transfer of deposit accounts of equal or greater amount from the firm to the Bank; that Templeton alone (as shown by the exhibits) appears to have corresponded with defendant concerning the notes; that defendant himself, as vice president of the Bank, wrote to Templeton acknowledging receipt of the two notes for $15,000 each, "signed

by yourself and Fred Fleming," and, having "deducted the discount, $900," inclosed the Bank's draft "order Fleming & Templeton for $29,100"; that when the notes fell due in December the correspondence concerning their renewal was conducted by defendant with Templeton alone, and they were treated as representing a single loan and the discount was charged by defendant or under his direction in a single item; that after the borrowers had become notoriously insolvent, in February, 1908, defendant took part in transferring the notes "without recourse" to the affiliated loan company in the manner and under the circumstances above stated; that the transfer was effected a few days after the visit of the bank examiner; that when the Deputy Comptroller wrote to the Bank, classifying "Fleming & Templeton $30,000" as an excessive loan and demanding that the directors responsible for making it should assume the loss, defendant joined in signing the reply that has been quoted;—all this, to say nothing of other circumstances that might be mentioned, would have warranted the jury in finding, notwithstanding defendant's denial, that in fact the disputed transaction was a single loan of $30,000 less discount, or, to be precise, $29,100, made to Fleming and Templeton jointly; that defendant knew and assented to this at the time; and that the taking of two notes was but a device to conceal the true nature of the transaction.

(2) Irrespective of whether there was but a single loan or were two separate loans, plaintiff in error contends that the liability of a surety must be added to his direct and primary liability in determining his total liabilities for money borrowed within the meaning of § 5200, and that in the present case, although the notes should be found to have represented two entirely separate loans, each within the limit, they must be added together in order to determine whether the limit was exceeded. *Cochran* v. *United States*, 157 U. S. 286, 295, 296, is cited, where it was held

that the word "liabilities," as employed in § 5211, Rev. Stats., included contingent liabilities. We do not regard the case as controlling, because the purpose of that section, and the language employed, differ materially from the purpose and the language of the provision we are dealing with. As to whether in § 5200 the words "the total liabilities . . . of any person . . . for money borrowed," etc., require the liability of a surety or of an indorser for money borrowed by another to be added to his direct liability for money borrowed by himself in ascertaining whether the limit is exceeded—whatever view we might entertain were the matter *res nova*—we are advised that by the practice and administrative rulings of the Comptroller of the Currency during a long period, if not from the beginning of national banking, liabilities which are incurred by one person avowedly and in fact as surety or as indorser for money borrowed by another are not included in the computation. We feel constrained to accept this as a practical construction of the section. And we are not prepared to say that in an action against a director who knows and relies upon the fact that a particular obligation is signed by one merely as surety, although not so described, the defendant may not be permitted to show the truth.

(3) In view of certain contentions urged here in behalf of defendant, and perhaps acceded to by the courts below, it should be said that the question whether defendant knowingly participated in or assented to the making of a loan in excess of the limit prescribed by § 5200 is not to be confused by any consideration of the supposed standing of the borrowers, personal or financial. The statutory limit is a special safeguard prescribed by Congress for the very purpose (among others) of preventing undue reliance upon the financial standing of borrowers. Nor would the absence of any improper motive or a desire for personal profit on defendant's part be a defense; nor the fact that

in spite of a loss upon this transaction the Bank remained solvent or even prosperous. Neither is the question of defendant's liability, or the extent of it, to be affected by the fact, if it be a fact, that other officers or directors of the Bank were in part responsible, yet defendant alone was sued; nor that the Bank refrained from suing him until after a change in the stockholding interest or control. Again, in the absence of some special agreement—and none such appears—it is immaterial whether the new stockholders were aware of the excessive loan, or of defendant's alleged liability in the premises, at the time they acquired their stock; or whether they possibly may now profit by an increase in the value of the shares in the event of a recovery against him.

It is clear from the language of § 5239, Rev. Stats., that *every* director knowingly participating in or assenting to a violation of any of the provisions of the act is "liable in his *personal* and *individual* capacity," without regard to the question whether other directors likewise are liable. The violation is in the nature of a tort, and the party injured may sue one or several of the joint participants. *Bigelow* v. *Old Dominion Copper Co.*, 225 U. S. 111, 132. And the liability extends to "all damages which the association, its shareholders, or any other person, shall have sustained in consequence of such violation." In the present action the Bank represents the interest of its shareholders, as well as of its creditors; and if there was a violation of the act by defendant, with resulting diminution of its assets, the Bank is entitled to recover the damages thus sustained, notwithstanding it remained solvent, and irrespective of any changes in its stockholding interest or control occurring between the time the cause of action arose and the time of the commencement of the suit or of the trial. Even if it appeared that new stockholders acquired their interests with knowledge of the fact that such a loss had been sustained and that defendant was responsible for it,

neither they nor the Bank would be thereby estopped from having full recovery from defendant. There is no reason in the law to disentitle a purchaser of shares from even relying upon the responsibility of directors to make good previous losses as an element adding intrinsic value to the shares. Compare *Bigelow* v. *Old Dominion Copper Co.*, 74 N. J. Eq. 457, 500.

(4) Defendant, among other defenses, pleaded the two-year statute of limitations of the State of Texas. Plaintiff demurred on the ground that this limitation was not a bar; and also replied setting up certain facts that need not now be recited. The demurrer was overruled.

The provisions of the Texas statutes upon the subject are Vernon's Sayles' Tex. Civ. Stats., 1914, Arts. 5687, 5688, and 5690, set forth in the margin.[1]

---

[1] Article 5687.—There shall be commenced and prosecuted within two years after the cause of action shall have accrued, and not afterward, all actions or suits in court of the following description:

1. Actions for trespass for injury done to the estate or the property of another.

2. Actions for detaining the personal property of another, and for converting such personal property to one's own use.

3. Actions for taking or carrying away the goods and chattels of another.

4. Actions for debt where the indebtedness is not evidenced by a contract in writing.

5. Actions upon stated or open accounts, other than such mutual and current accounts as concern the trade of merchandise between merchant and merchant, their factors or agents. In all accounts, except those between merchant and merchant, as aforesaid, their factors and agents, the respective times or dates of the delivery of the several articles charged shall be particularly specified, and limitations shall run against each item from the date of such delivery, unless otherwise specially contracted.

6. Action for injury done to the person of another.

7. Action for injury done to the person of another where death ensued from such injury; and the cause of action shall be considered as having accrued at the death of the party injured.

Article 5688.—There shall be commenced and prosecuted within

In our opinion, the action is not one of the kinds speci-
fied in Art. 5687, to which the two-year limitation applies,
but is within the general description of Art. 5690 and
subject only to the limitation of four years. Hence the
limitation pleaded was no defense; and it is not contended
that there was any basis in fact for pleading the four-year
limitation.

(5) Assuming the Fleming and Templeton notes were
found to represent an excessive loan, knowingly partici-
pated in or assented to by defendant as a director of the
Bank, in our opinion the cause of action against him
accrued on or about June 10, 1907, when the Bank through
his act parted with the money loaned, receiving in return
only negotiable paper that it could not lawfully accept
because the transaction was prohibited by § 5200, Rev.
Stats. The damage as well as the injury was complete at
that time, and the Bank was not obliged to await the
maturity of the notes, because immediately it became
the duty of the officers or directors who knowingly partici-
pated in making the excessive loan to undo the wrong
done by taking the notes off the hands of the Bank and
restoring to it the money that had been loaned. Of

---

four years after the cause of action shall have accrued, and not after-
ward, all actions or suits in court of the following description:

1. Actions for debt where the indebtedness is evidenced by or
founded upon any contract in writing.

2. Actions for the penalty or for damages on the penal clause of a
bond to convey real estate.

3. Actions by one partner against his co-partner for a settlement of
the partnership accounts, or upon mutual and current accounts con-
cerning the trade of merchandise between merchant and merchant,
their factors or agents; and the cause of action shall be considered as
having accrued on a cessation of the dealings in which they were in-
terested together.

Article 5690.—Every action other than for the recovery of real
estate, for which no limitation is otherwise prescribed, shall be brought
within four years next after the right to bring the same shall have
accrued, and not afterward.

course, whatever of value the Bank recovered from the borrowers on account of the loan would go in diminution of the damages; but the responsible officials would have no right to require the Bank to pursue its remedies against the borrowers or await the liquidation of their estates. The liability imposed by the statute upon the director is a direct liability, not contingent or collateral.

(6) The question is raised whether the entire sum loaned, plus interest and less salvage, should be treated as damages sustained by the Bank through the violation of the provisions of § 5200, Rev. Stats.—assuming it be found that defendant did knowingly violate them—or whether only the excess above what lawfully might have been loaned (presumably $20,000) should be so regarded. We assume that if, in good faith and in the ordinary course of business, defendant had made a loan of $20,000 to Fleming and Templeton, and if while this loan remained unpaid he had afterwards and as a separate transaction unlawfully loaned them an additional $10,000, in excess of the limit, the damage legally attributable to his violation of the limiting provision would have been but $10,000. But that is not this case. According to the evidence, the $30,000 less discount was paid out by the Bank as a single payment; and if the jury found it to have been loaned in excess of the statutory limit (whether in form one loan or two) it must be upon the ground that it was a single transaction. That being so, it would follow that the entire amount disbursed by the Bank was disbursed in violation of the law. The cause of action against a director knowingly participating in or assenting to such excessive loan would be complete at that moment, and entire; there would be no legal presumption that the borrowers would have accepted a loan within the limit, if their application for the excessive loan had been refused; nor that a director who in fact violated his duty as defined by law would, if mindful of it, have loaned them even $20,000. To mitigate in his favor

the damages resulting from a breach of his statutory duty
by resorting to the hypothesis that if he had not disre-
garded the law in this respect he would have pursued a
different course of action within the law, would be an
unwarranted resort to fiction in aid of a wrongdoer, and
at the expense of the party injured. Hence, the entire
excessive loan would have to be regarded as the basis for
computing the damages of the Bank.

(7) In behalf of defendant it is insisted that, assuming
the loan was excessive, no loss accrued to the Bank by
reason of it, because the Fleming and Templeton notes
and indebtedness were transferred to the loan company
February 12, 1908, for a cash consideration equivalent
to their face value less interest to maturity.

Plaintiff in error contends that the Bank and the loan
company were so identical in ownership and united in
management that the latter was but the *alter ego* of the
former, and a loss to the loan company on the notes was
the same as a loss to the Bank, not only practically but in
contemplation of law. On the other hand, the argument
of defendant in error regards the two corporations as if
they were wholly independent; treats the transfer of the
notes from the Bank to the loan company, in February,
1908, as valid and the money or credit contemporaneously
transferred to the Bank like money coming from an out-
side party; and looks upon the retransfer in January, 1910,
as voluntary on the part of the Bank and an unnecessary
assumption of a loss that otherwise it had escaped.

We cannot accede to either contention in the extreme.
Because the Bank and the loan company were distinct
legal organizations, operating under separate charters
derived from different sources, and possessing independent
powers and privileges, we are constrained to hold that,
notwithstanding the identity of stock ownership and
their close affiliation in management, for some purposes
they must be regarded as separate corporations, for

instance, as being capable in law of contracting with each other. See *Nashua Railroad* v. *Lowell Railroad*, 136 U. S. 356, 372, 373, 375, *et seq.* But in considering the practical effect of such inter-corporate dealings, especially as bearing upon the duties of the common directors and the authority of the stockholders to control them, we need not and ought not to overlook the identity of stock ownership. Thus, the transfer of the notes in February, 1908, from the Bank to the loan company, in consideration of their full face value ostensibly or actually paid by the company to the Bank, evidently could have no effect in relieving the stockholding interest from loss, since each stockholder of one corporation had a corresponding interest in the stock of the other, and any theoretical saving that accrued to him as a stockholder of the Bank was balanced by a corresponding loss sustained in his capacity as a stockholder of the company. At the same time the stockholders in reviewing that transaction might lawfully and properly base their action upon all the facts of the situation; recognizing the legal separateness of the corporations as existing in order to test the validity of the transfer and the feasibility of setting it aside without litigation, while giving effect to their community of interest in deciding whether this should be done, and, if so, then in what manner and upon what terms.

(8) Regarding the two corporations as legally separate, and ignoring for the moment the community of stockholding interest, it is plain that the transaction of February 12, 1908, in which the Bank sold the Fleming and Templeton notes and indebtedness to the loan company for their full face value, was *prima facie* tantamount to a satisfaction of the damages that the Bank had sustained by reason of the excessive loan; but that it had this effect only provided the transaction was good and valid as against the loan company and its stockholders, or was duly ratified by them. For if it was invalid, or was made

under circumstances rendering it voidable by the loan
company, or the stockholders, neither the Bank nor
defendant was entitled to have the transaction stand for
their benefit; and if in fact it was avoided for good cause,
the Bank would be entitled to its action against defendant
the same as if the annulled transaction never had occurred.

Was there good cause for the rescission? The fact that
the same persons were directors and managers of both
corporations subjects their dealings *inter sese* to close
scrutiny. That two corporations have a majority or
even the whole membership of their boards of directors in
common does not necessarily render transactions between
them void; but transactions resulting from the agency of
officers or directors acting at the same time for both must
be deemed presumptively fraudulent unless expressly
authorized or ratified by the stockholders; and certainly
where the circumstances show, as by the undisputed
evidence they tended to show in this case, that the trans-
action would be of great advantage to one corporation at
the expense of the other, especially where in addition to
this the personal interests of the directors or any of them
would be enhanced at the expense of the stockholders, the
transaction is voidable by the stockholders within a
reasonable time after discovery of the fraud. *Twin-Lick
Oil Co.* v. *Marbury*, 91 U. S. 587, 589; *Wardell* v. *Railroad
Company*, 103 U. S. 651, 657, *et seq.; Thomas* v. *Brownville,
&c. R. R. Co.*, 109 U. S. 522, 524; *Richardson* v. *Green*,
133 U. S. 30, 43; *McGourkey* v. *Toledo & Ohio Ry. Co.*, 146
U. S. 536, 552, 565.

The evidence having tended to show a transfer of the
notes in question from the Bank to the loan company
"without recourse," for a consideration equivalent to
their full face value, after the insolvency of the makers had
been brought to light, with resulting discredit of the notes
as marketable paper and probable inability of the makers
to pay them; a transaction carried out by directors and

officers who acted as agents or trustees for both corporations, and one at least of whom, as the jury might find, was subject to criticism from the Comptroller of the Currency, and to an action at the suit of the Bank, for making an excessive loan; it clearly was open to the jury to find that the transfer was fraudulent as against the loan company, and as against the stockholders of both companies. The jury should have been instructed to this effect; and further, that if they found the transfer to have been fraudulent, the stockholders had the right to rescind it within a reasonable time after discovery of the fraud; and that if, having such right, the stockholders of the loan company asserted it and gave notice of its claim to the Bank in the manner shown by the minutes, and the Bank recognizing and acknowledging the justness of the claim restored to the loan company what was accepted as the equivalent in value of that which the Bank had received in the transaction of February, 1908, this was not to be regarded as a voluntary or unnecessary assumption of loss by the Bank, but on the contrary the result, so far as defendant was concerned, was the same as if by court decree, in a suit brought by the loan company, or by the stockholders, the Bank had been compelled to make such restitution; and that thereafter the rescinded transaction could not be regarded as amounting, even in form of law, to a satisfaction of the damages sustained by the Bank as a result of the Fleming and Templeton loan.

So far as the evidence showed, neither the stockholders of the loan company, nor indeed its board of directors, ever expressly ratified or affirmed the transfer. Nor does it appear that there was any unreasonable delay on the part of the stockholders in taking action to set it aside after they had become aware of the circumstances; such delay as there was the Bank waived, as it had a right to do; and defendant does not appear to have changed his position or to have been prejudiced by reason of it.

Assuming, in defendant's favor, that because the corporations were legally separate they could not undo the transaction of February, 1908, without formal corporate action, the procedure adopted was sufficient for the purpose. It is objected that the personnel of the boards was changed for the very purpose of accomplishing the rescission, and that the new members were mere figureheads or dummies for the controlling stockholders and had no *bona fide* stock of their own. But if the transaction of 1908 was a fraud as against the loan company, and done without authority of the stockholders, they were quite within their rights in acting through dummies if necessary in order to set it aside. We do not think it was necessary to change the membership of the boards; similar action by boards having identical membership would have had the same effect, if done by the express authority of the stockholders in order to undo an improper and unlawful act of former directors injurious to their interests.

It is said that the rescission was put through in order to enable the Bank to bring the present action against defendant. But it was not done to build up a ground of action against him, for this arose if at all prior to February 12, 1908, the damage to the Bank being sustained when with his participation and assent its money was paid to Fleming and Templeton in June, 1907, for promissory notes that the Bank could not lawfully take. Defendant's liability to the Bank, if he was liable, was direct and primary, and to it the notes occupied the status of collateral security. Had the disposition made of them in February, 1908, been valid and unassailable, it would have borne the appearance of a satisfaction of the damages only because the two corporations were legally separate; but in substance, so far as the stockholders were concerned, it would have satisfied nothing because it merely transferred money to them in one capacity by taking it from them in another. Defendant had no right to have the transaction remain

in effect as a screen to protect him from suit by the Bank under § 5239, Rev. Stats. So far as it may be supposed to have protected him while it remained unrescinded, the result was entirely gratuitous, no consideration having proceeded from him in the matter. Indeed, if his act in shifting the discredited loan was done in part to give him immunity from such an action as the present, this would furnish an additional ground entitling the stockholders to set the transfer aside. And if, either on this ground, or on the ground that the transfer was put through for the advantage of one corporation at the expense of the other by officers or directors acting at the same time for both and without the authority of the stockholders, the transaction was voidable by the stockholders and they resolved to avoid it, it would savor of absurdity to sustain defendant's contention that this was done in order to enable the Bank to sue him; for of course they would have the right to do it for that very purpose.

(9) In defendant's behalf it is insisted that at the time of the proceedings of January, 1910, the value of the cotton mill property was much less than $65,000, so that in the exchange made the Bank in effect parted with little or no value for the return to it of the Fleming and Templeton notes and indebtedness. But for reasons already sufficiently indicated, we are of opinion that defendant is not entitled to raise an inquiry into the value of this property, as bearing either upon the question of the Bank's right of action against him or upon the question of damages. If the loan company or the stockholders had good ground for rescinding the 1908 transaction, and this was done pursuant to their resolution, they might waive a return of the precise consideration and accept such equivalent in exchange as to them seemed proper. Because of the identity of the stockholding interest the transaction, even while it stood, was, as we have shown, only a pseudo-satisfaction of the Bank's loss in the Flem-

ing and Templeton loan; and when the real parties affected
by this loss undertook on just grounds to set aside the
transfer of the notes, and took such proceedings through
action of the two corporations as were necessary for that
purpose, they had a right to recognize the community of
interest in settling the terms upon which this should be
done; and defendant has no standing to complain.

If there be a seeming inconsistency in sustaining a
rescission of the 1908 transaction avowedly based upon
the ground that the loan company had unjustly been
subjected to a loss therein, while at the same time we treat
as unimportant the question whether upon such rescission
full restitution was made to that company, it should be
said that we treat it as unimportant only so far as defend-
ant is concerned; and if there be inconsistency it is no
more than corrective of the unreality of the 1908 trans-
action itself.   It is defendant who invokes that trans-
action as an actual realization by the Bank of full value
through a sale of the notes that it held as collateral security
for its claim against him.   If, regarding it as an actual
sale, it was voidable because done by agents acting at the
same time in a dual capacity or for other reasons, he cannot
complain that the parties entitled to avoid it treated it as
actual for the purpose of setting it aside, and in the con-
sequent readjustment recognized a substantial identity of
interest between seller and purchaser in the rescinded
transaction that rendered it hardly an actual sale.   For,
to the extent that the sale was a sham, there was no
realization by the Bank upon the collateral security and
hence no satisfaction of the damages claimed against him.

The judgment under review must be reversed, to the
end that there may be a new trial in accordance with the
views above expressed.

> *Judgment reversed, and the cause remanded to the District
> Court for further proceedings in conformity with this
> opinion.*