**GUARANTY TRUST CO. v.
UNITED STATES.**

No. 68.

District Court, E. D. Washington, S. D.
April 3, 1942.

418

Cheney & Hutcheson, of Yakima, Wash., for plaintiff.

Lyle Keith, U. S. Atty., Harvey Erickson, Asst. U. S. Atty., both of Spokane, Wash., and Thomas R. Winter, Sp. Asst. to the Chief Counsel, Bureau of Internal Revenue, of Seattle, Wash., for defendant.

SCHWELLENBACH, District Judge.

The plaintiff, as liquidating trustee of Yakima Holding Corporation (hereafter called the Holding Company), sues to recover $26,933.86 which was the amount of a deficiency assessment with penalties collected from the Holding Company on its 1935 income. Plaintiff's theory is that the income upon which the assessment was levied was that of the Yakima First National Bank (hereafter called the Bank) which made the return on such income but which paid no tax thereon because of the net deficit resulting that year from the Bank's operations. Because of the complicated nature of the testimony and the many exhibits introduced, I am filing simultaneously with this opinion a detailed opinion concerning the facts.

During 1934 and 1935, the Holding Company owned all of the capital stock of the plaintiff and of the Bank. In addition, the Holding Company had a $52,000 investment in the First National Bank of Wapato and a $69,000 investment in real estate. Its stock was widely held. The officers and directors of the three corporations were practically identical. All were dominated by R. M. Hardy and a small group of associates. Mr. Hardy was president of each of the corporations and he and two of the other directors, Larson and Miller, were substantially interested in the Sunshine Mining Company (hereafter called Sunshine). The oral testimony of plaintiff was submitted by Mr. Hardy, Mr. Rightmire, the treasurer of the corporations, and Mr. Crawford, the cashier of the Bank. Four of the men who actively participated in the transactions herein involved died between 1934 and the time of trial. The three witnesses who did testify are highly reputable citizens of Yakima. This testimony was given in such a way as to merit consideration by the Court.

The Bank's capital was impaired and the Banking Department was insisting that certain of its assets be removed. Immediately preceding the transactions involved here, there occurred a phenomenal activity in the stock of Sunshine which later developed a very rapid appreciation in its market value. In August, 1934, the Holding Company purchased 7,500 shares of Sunshine. Of these, it placed 2,500 shares in the name of its secretary and 5,000 shares in the name of the Bank. These 7500 shares were carried on the books of the Holding Company as its property. It received the dividends on them. At the end of the year, it wrote up their value on its books. At the 1935 stockholders' meeting, the auditor's report to the stockholders showed the ownership of this stock by the Holding Company. The minutes of the executive committee of the Holding Company referred to this stock as "the 7500 shares of Sunshine stock already owned by the Yakima Holding Corporation." On its income tax return, it showed that the stock was acquired by "cash purchase." When the stock was sold by the Bank through a brokerage house, the Bank gave the Holding Company its receipt for the stock. No one with the slightest familiarity with corporate accounting practices could conclude from the written evidence in this case other than that the Holding Company owned this stock.

On December 11, 1934, Mr. Alex Miller, who was one of the dominating group in these corporations, by an exchange of letters arranged to trade 5,000 shares of Sunshine for 4,000 shares of the stock of the Holding Company. His stock was placed in escrow with the plaintiff pending the time that the Holding Company could pick up the necessary 4,000 shares of its stock. Before that was done and in April, 1935, all of the 12,500 shares of Sunshine stock were delivered to the Bank and by it delivered to a Seattle brokerage concern which sold 11,000 shares of the stock on the market and paid the Bank $199,225, and returned to the Bank 1,500 shares which the Bank retained. The Bank thereupon issued to the Holding Company two checks—one for $61,451.50, the amount at which the 7,500 shares of Sunshine stock then was carried on the Holding Company's books. The other check was for $60,000, which was for 5,000 shares of Sunshine stock at $12.00 per share. The balance of $77,773.95 was retained by the Bank and put in its undivided profits account. Thereupon the Holding Company caused the necessary entries to be made upon its books. As regards the 5,000 shares acquired through the transaction with Alex Miller, these were the first entries made upon the Holding Company's books.

Plaintiff contends in this case, and its oral testimony supported that contention, that the whole transaction as to both groups of stock was for the benefit of the Bank. Plaintiff pleads and attempts to prove that the Holding Company's position in the transaction was merely that of trustee. It explains that the transaction was thus handled because of the statutory restriction on stock ownership by national banks. 12 U.S.C.A. § 24(7). Plaintiff introduced a letter dated December 12, 1934, which its witnesses testified was signed upon that date by the Holding Company and the Bank purporting to confirm an arrangement made in August, 1934, under which the Holding Company agreed to act as trustee for the Bank and to handle this transaction for a compensation in the amount of dividends which might be paid by Sunshine on its 7,500 shares of stock and for a small write-up in the value of the stock in an amount to be agreed upon between the parties. The Commissioner found that the Holding Company was the owner of all of this stock and that the profits arising out of the sale were the Holding Company's profits which it directed into the Bank for the purpose of avoiding tax liability. He made a deficiency assessment with a fraud penalty.

■ At the threshold of this case I am met with strenuous argument as to the effect to be given to the presumption of correctness of the Commissioner's ruling. This is not a case in which anyone's thinking need be confused by getting involved in the many ramifications of that vexatious question. Tax cases deal with realities and not fine spun legalistic distinctions. Moore v. Commissioner, 7 Cir., 124 F.2d 991. Assuredly a presumption is not evidence and it carries no affirmative probative weight. Ariasi v. Orient Ins. Co., 9 Cir., 50 F.2d 548. What we have here, however, is not what plaintiff characterizes as a mere procedural device which will melt like snow when subjected to the heat of a scintilla of proof introduced by the adverse party. The complication arises from the use of the word presumption by defendant's counsel and in many courts' opinions. As Wigmore points out (Wigmore on Evidence, 3d Ed., § 2490), presumptions operate on specific fragments of the issue. Here the question involves the burden of proof as distinguished from the burden of going ahead with the evidence. Or, as Mr. Wigmore puts it, Id., § 2488,

the burden of the risk of non-persuasion of the jury (or judge when he is the trier of the facts) as distinguished from the burden of going forward with evidence so as to so satisfy the judge as to stay in court. The first burden never shifts since no fixed rule of law can be said to shift. Id., § 2489. In analyzing the nature of the first burden, there are specific rules for specific classes of cases resting for their ultimate basis upon broad reasons of experience and fairness. Id., § 2486. The specific rule in this class of cases is that persons situated as is the plaintiff who seek to recover tax money paid to the Government on the basis of the Commissioner's ruling have the burden of submitting clear and convincing proof in support of their position in order to recover. Pearce v. ·Commissioner, 62 S.Ct. 754, 86 L.Ed. —, decided March 9, 1942; Helvering v. Fitch, 309 U.S. 149, 60 S.Ct. 427, 84 L.Ed. 665; Welch v. Helvering, 290 U.S. 111, 54 S.Ct. 8, 78 L.Ed. 212; Wickwire v. Reinecke, 275 U.S. 101, 48 S.Ct. 43, 72 L.Ed. 184.

■ Necessary to a consideration of this case but not conclusive in its result is a discussion of the purpose and effect of § 16, Chap. 89, the Act of June 16, 1933, 48 Stat. 184, 12 U.S.C.A. § 24(7), which reads:

" * * * The business of dealing in investment securities by the association shall be limited to purchasing and selling such securities without recourse, solely upon the order, and for the account of, customers, and in no case for its own account, and the association shall not underwrite any issue of securities. * * *

"Except as hereinafter provided or otherwise permitted by law, nothing herein contained shall authorize the purchase by the association of any shares of stock of any corporation. * * *"

There is no serious difference between the parties in the opinion that since this law contains no positive prohibition against the purchase of corporate stocks by a National bank that a bank's contract to purchase stock is not illegal and void, but is ultra vires and voidable. Lantry v. Wallace, 182 U.S. 536, 21 S.Ct. 878, 45 L.Ed. 1218; First Nat. Bank v. Stewart, 107 U.S. 676, 2 S.Ct. 778, 27 L.Ed. 592. That being true, plaintiff's contention that in this case—"The Bank could not lose. If the price went up it could enforce the deal against the Holding Company. If it went

down it could refuse to perform."—must be accepted as a correct statement of the legal consequences of the situation. This legal cul de sac, however, does not detract one whit from the conclusion that what was done here was in direct contravention with the public policy of the United States. A public policy deliberately declared by the Congress as the outgrowth of a financial disaster visited upon stockholders of corporations and depositors of banks which had its roots in thousands of transactions paralleling this one.

■ The close relationship between these corporations and the mutuality of their officers and the dominance of both by the same stockholders make necessary an understanding of the attitude of the Federal Courts on the effect of such relationships. Fortunately, that attitude has been stated with completeness and clarity by the Supreme Court in Geddes v. Anaconda Mining Co., 254 U.S. 590, 41 S.Ct. 209, 212, 65 L.Ed. 425. There the court, speaking through Mr. Justice Clarke, said:

"The relation of directors to corporations is of such a fiduciary nature that transactions between boards having common members are regarded as jealously by the law as are personal dealings between a director and his corporation, and where the fairness of such transactions is challenged the burden is upon those who would maintain them to show their entire fairness and where a sale is involved the full adequacy of the consideration. Especially is this true where a common director is dominating in influence or in character. This court has been consistently emphatic in the application of this rule, which, it has declared, is founded in soundest morality, and we now add in the soundest business policy. Twin-Lick Oil Co. v. Marbury, 91 U.S. 587, 588, 23 L.Ed. 328; Thomas v. Brownville, Ft. Kearney & Pacific R. R. Co., 109 U.S. 522, 3 S.Ct. 315, 27 L.Ed. 1018; Wardell v. Railroad Co., 103 U.S. 651, 658, 26 L.Ed. 509; Corsicana National Bank v. Johnson, 251 U.S. 68, 90, 40 S.Ct. 82, 64 L.Ed. 141."

From this rule, there has been no deviation. It was approved and amplified in Pepper v. Litton, 308 U.S. 295, 60 S.Ct. 238, 84 L.Ed. 281. The healthfulness of the rule is undeniable.

■ The one problem in this case is to determine whether the Holding Company or the Bank had the power to dispose of the profit (or income) from the sale of this Sunshine stock. If the Holding Company was merely the trustee for the Bank, its duty was to turn the profit over to the Bank and it had no power over it. But if the Holding Company was in truth the owner of the stock and its act in turning the profit over to the Bank resulted only from the exercise of power by the officers of the Bank through their positions with the Holding Company, this would in no way negative the tax responsibility of the Holding Company. The power to dispose of income from property is the equivalent of ownership of it and the exercise of the power to procure its payment to another is within the reach of the tax law. Harrison v. Schaffner, 312 U.S. 579, 61 S.Ct. 759, 85 L.Ed. 1055; Helvering v. Horst, 311 U.S. 112, 61 S.Ct. 144, 85 L. Ed. 75, 131 A.L.R. 655; Helvering v. Eubank, 311 U.S. 122, 61 S.Ct. 149, 85 L.Ed. 81; Lucas v. Earl, 281 U.S. 111, 50 S.Ct. 241, 74 L.Ed. 731. When plaintiff so vigorously resists the consideration of this line of cases on the ground that in them the taxpayer had complete dominion over the involved assets, it simply begs the question. That is what this case is about. As Mr. Justice Holmes indicated in Lucas v. Earl, supra, it is the court's task to ascertain whether an effort is being made to attribute fruits "to a different tree from that on which they grew."

After hearing the evidence and studying the exhibits, I am firm in my conclusion that this case involves two separate and distinct transactions. While they later merged in that the stock was sold at approximately the same time and the profits from both were directed into the Bank, that does not detract from my conclusion that they must be considered separately. It is true that the oral testimony submitted by plaintiff's witnesses treats of both transactions in the same way. This oral testimony, however, cannot overcome the written record which was made at the time. As a consequence, I am treating the two transactions separately in this opinion.

■ I am convinced that the plaintiff has sustained its burden of proof as to the stock which was acquired from Alex Miller. As to that transaction, the oral evidence is not contradicted by anything in writing. There were no entries made upon the Holding Company's books until after the transaction was completed and they were set up in such a way as to be susceptible of either interpretation. The only

written evidence which detracts from this conclusion is in the minutes of the Holding Company's executive committee meeting which provided that the Bank would take over the Miller stock at $15 a share instead of $12 a share as it later did. I have decided to resolve that doubt in favor of the plaintiff and to conclude that the use of the figure 15 was an error in the minutes. Having reached this conclusion, it follows that in so far as tax was levied on the profit accruing from the sale of the 3,500 shares out of the Miller stock, the assessment was erroneous.

An entirely different situation exists, however, as to the original 7,500 share transaction. As to this, the oral testimony of the plaintiff is completely negatived and overwhelmed by the written evidence in the case. Every stroke of the pen on the Holding Company's books of account points unerringly to the ownership of this stock by the Holding Company. It is inconceivable to me that, if the Holding Company was in fact merely the trustee, it would have written up the transaction in the way it did. It set up its ledger account in such a way as to indicate ownership. Its journal entries from beginning to end indicated ownership. Its receipt of the dividends was an indication of ownership. It made its entry as to the write-up as of December 31, 1934, showing appreciation of $1,875, instead of waiting till the sale was made. I never heard of an entry showing a year-end appreciation write-up being made by a trustee of stock. It reported ownership of this stock to its stockholders at their annual meeting. Even the minutes of the executive committee upon which plaintiff relies show this Sunshine stock to be "already owned by the Yakima Holding Corporation." There can be no. disagreement between reasonable minds on the conclusion that plaintiff has utterly failed to sustain its burden of proof on this transaction.

Plaintiff's counsel argues that the court is forced either to accept plaintiff's oral testimony as controlling or to brand plaintiff's position as a deliberate hoax to avoid tax liability and plaintiff's witnesses as perjurers. Such a dilemma is not presented here. To test this proposition requires only a statement of the case with full acceptance of plaintiff's evidence. Plaintiff's testimony is that in August, 1934, the officers of the Holding Company, orally and informally, agreed with themselves as officers of the Bank that the Holding Company would take $60,000 of its money (the fact that it may have borrowed the money made it no less the Holding Company's money) and use it to speculate in mining stock. (The fact that Sunshine stock went up does not make its purchase any less a speculation). The agreement was that the Holding Company should hold the stock as trustee for the Bank. (This, despite the fact that the Holding Company's charter did not authorize it to act as trustee and that it never acted as trustee in any other transaction). The compensation the Holding Company was to receive for the use of this substantial part of its assets was to be the dividends which might be declared upon the mining stock while the Holding Company was holding it, plus a small write-up which might be allowed to the Holding Company if the joint officers deemed it advisable. It was agreed that any profits which might accrue upon the stock would be the profits of the Bank and that any losses upon the stock would be the losses of the Bank. (But, as plaintiff's counsel points out in his brief, this portion of the agreement was void because, in so far as these gentlemen were acting for the Bank in this regard, their action being ultra vires and contrary to the public policy, no court would ever have enforced that provision of the contract). This agreement was wholly informal. There was no meeting of the directors or the executive committee of either corporation. Thereupon, under the direction of the Secretary of the Holding Company, entries were made in the books of the Holding Company in such a way as to offer conclusive proof in the event the Bank might later seek to repudiate the contract that the title to the stock was in the Holding Company as its owner and not as trustee. Thereafter, on December 12, 1934, the foregoing agreement was reduced to writing. That writing consisted of a letter signed by the Secretary of the Holding Company and accepted by the cashier of the Bank. (Giving to this letter its full value from an evidentiary point of view, clearly it added nothing to the legal consequences of the oral, informal agreement). On January 7, 1935, the board of directors of the Holding Company met. No action was taken by them to ratify or confirm the August agreement. Indeed, on the same day under the direction of the Secretary of the Holding Company, entries were made upon the books of

that corporation showing the $1,875 write-up in the value of the Sunshine stock in such a way as to furnish further indubitable proof of the Holding Company's ownership of the stock in the event the Bank should seek to repudiate the terms of its contract. Then, on February 5, 1935, at a stockholders' meeting attended in person or by proxy by the holders of 47,394 shares of the Holding Company stock, the secretary read to the stockholders the auditor's report showing the investment by the corporation of $61,451.50 in stock. (This is the same amount as Sunshine stock was carried on the books). No statement was made to the stockholders concerning the contract which it is claimed had been entered into nor of the fact that there was an agreement with the Bank under which the Bank was legally entitled to get the profits which might accrue while the Holding Company would sustain the losses which might ensue. On April 12, 1935, for the first time the executive committee of the Holding Company took formal action ratifying the contract informally entered into in August of 1934. The testimony shows that during all of the period no action of any kind concerning the agreement was ever taken by the board of directors of the Bank or its executive committee or of its stockholders. The record does not disclose how many of such meetings were held but the court judicially knows that institutions of this type hold frequent meetings of the executive committee, monthly meetings of the board of directors, and annual meetings of the stockholders during the spring of the year.

In view of this record of accumulated transgressions against the most primitive corporate responsibilities, can anyone assert where the title of this stock would have been adjudged had the issue been raised by the Holding Company stockholders had they known the facts? Only the veriest tyro in the law would make such an assertion on either side of the question with any degree of assuredness. The court must know which corporation had actual command over the property taxed. Griffiths v. Helvering, Commissioner, 308 U. S. 355, 60 S.Ct. 277, 84 L.Ed. 319. The only command the Bank exercised arose from the mutuality of the corporate officers at which the court must look with an adverse eye. The court need not resolve doubts nor speculate as to outcomes. Pearce v. Commissioner, supra. Without question, the showing made in the Pearce case was much stronger than plaintiff's showing here. Since the Supreme Court there held that the petitioner had failed to sustain her burden of showing doubts and uncertainties, I am bound here to hold that plaintiff has failed to sustain its burden of submitting clear and convincing proof.

Plaintiff is entitled to recover the amount paid on the fraud penalty. On this question, the burden rests with the defendant. The fraud meant in the statute is actual, intentional wrongdoing and the intent required is the specific purpose to evade the tax believed to be owed, 26 U.S.C.A. Int.Rev.Code § 1112. Griffiths v. Commissioner, 7 Cir., 50 F.2d 782; Duffin v. Lucas, 6 Cir., 55 F.2d 786; Mitchell v. Commissioner, 5 Cir., 118 F.2d 308. The defendant submitted no testimony on this point but asks me to conclude from the transaction that plaintiff must have had fraudulent intent at the time of making the return. Such a conclusion is not justified. After all, this income was reported. The report as to its receipt was made by the wrong company. While it may have been negligently made, that is not sufficient to support the conclusion of fraudulent intent. It does not lie within the court's power to change the penalties assessed. That is an administrative function. Duffin v. Lucas, supra.

Judgment will be entered in accordance with this opinion.