# Richmond

FEDERAL DEPOSIT INSURANCE CORPORATION, RECEIVER, ETC.
v. G. WALTER MAPP'S EXECUTOR, ET ALS.

March 4, 1946.

Record No. 3010.

Present, Campbell, C. J., and Holt, Hudgins, Gregory, Browning and
Spratley, JJ.

972

The opinion states the case.

*Earl W. White, Ben T. Gunter, Jr., H. M. Woodward, Francis C. Brown, James M. Kane* and *Robert A. Dixon,* for the plaintiff in error.

*J. Brooks Mapp, George Walter Mapp, Jr., H. Ames Drummond* and *B. Drummond Ayres,* for the defendants in error.

Hudgins, J., delivered the opinion of the court.

The Federal Deposit Insurance Corporation, as receiver for the Parksley National Bank, instituted this action against Clyde P. Figgs, S. Claude White, Emma P. Parsons, James A. Middleton and G. Walter Mapp, Jr., executor of G. Walter Mapp, deceased, to recover $4,531.06, alleged to be the loss suffered by an excessive loan made to the Parksley Realty Company by the Parksley National Bank and approved by defendants, as directors. From an adverse verdict and judgment, the plaintiff in the trial court obtained this writ of error.

The action is based upon the alleged violation of two Federal statutes—U. S. C. A., Title 12, secs. 84, 93 (U. S. Rev. Stat., secs. 5200, 5239). Section 84 prohibits any national bank from making a loan to any one person of more than 10% of the amount of the unimpaired combined capital stock and surplus. The pertinent provision of section 93 was quoted and construed in *Corsicana Nat. Bank* v. *Johnson,* 251 U. S. 68, 71, 40 S. Ct. 82, 64 L. Ed. 141.*

---

* " 'Sec. 5239. If the directors of any national banking association shall knowingly violate, or knowingly permit any of the officers, agents, or servants of the association to violate any of the provisions of this Title, all the rights, privileges, and franchises of the association shall be thereby forfeited. . . . And in cases of such violation, every director who participated in or assented to the same shall be held liable in his personal and individual capacity for all damages which the association, its shareholders, or any other person, shall have sustained in consequence of such violation.'

"Under the rule settled by familiar decisions of this court, in order for

It is the duty of the State court to follow the interpretation and construction placed on the statutes by the Federal courts.

The Parksley National Bank, under its charter from the Federal Government, conducted a bank for a number of years at Parksley, Virginia. During the depression, beginning in 1929, the bank acquired in due course three parcels of realty—Mason's storehouse in the town of Parksley for $25,000, the Hurst storehouse in Tasley for $4,500, and a vacant lot adjacent to the bank building for $1,500. In 1933 the Parksley Realty Company was formed and chartered by persons interested in the success of the bank, for the purpose of taking over this real estate without loss to the bank. The Realty Company was capitalized for $25,000. Stock of the par value of $15,000 was sold for cash. One J. W. Chandler subscribed to capital stock of the par value of $10,000 but failed to pay for it. The Realty Company gave its note to the bank for the $10,000 and held the stock of Chandler. It borrowed an additional $2,000 from the bank, which was subsequently paid. The Realty Company also borrowed $10,000 from C. B. Ross and $3,000 from A. J. Rew. The bank actually received $19,000 in cash and held the Realty Company notes for $12,000 as the purchase price of $31,000 for the three lots. Later, the Realty Company spent $5,500 in necessary repairs on the Mason building and expended $3,500 in the construction of a building on the vacant lot which was rented as a post office.

The $10,000 note of the Realty Company was neither signed nor endorsed by Chandler. $2,000 was paid on this note by the Realty Company. After Chandler's death the

the Bank to prevail in this action it must appear not only that the liabilities of a person, company, firm, etc., to the Bank for money borrowed were permitted to exceed the prescribed limit, but that defendant, while a director, participated in or assented to the excessive loan or loans not through mere negligence but knowingly and in effect intentionally, *Yates* v. *Jones Nat. Bank*, 206 U. S. 158, 180, 27 S. Ct. 638, 51 L. Ed. 1002; with this qualification, that if he deliberately refrained from investigating that which it was his duty to investigate, any resulting violation of the statute must be regarded as 'in effect intentional,' *Thomas* v. *Taylor*, 224 U. S. 73, 82, 32 S. Ct. 403, 56 L. Ed. 673; *Jones Nat. Bank* v. *Yates*, 240 U. S. 541, 555, 36 S. Ct. 429, 60 L. Ed. 788."

Realty Company presented its claim for $10,000 against Chandler's estate but only $8,000 was allowed, apparently on the theory that that was all the Realty Company owed the bank on the strength of Chandler's subscription to stock. It is to be noted that the claim was allowed as a debt owing by Chandler's estate to the Realty Company and not as a debt owing by Chandler to the bank.

In the spring of 1937, C. B. Ross instituted an action against the Realty Company to reduce his $10,000 debt to a judgment. The bank held a note of the Realty Company for $8,000 and a claim against it for $1,500, the unpaid purchase price of the vacant lot. These two obligations were combined into one note totalling $9,500. On June 4, 1937, the bank caused the Realty Company to confess judgment on this obligation for $9,500, and on the same day A. J. Rew obtained a judgment for $3,000, the amount of his loan to the Realty Company. Three days later, on June 7, Ross obtained a judgment for the sum of $10,000 against the Realty Company.

Within four months from June 4, the date the Realty Company confessed judgment in favor of the bank, C. B. Ross and A. J. Rew filed a petition in involuntary bankruptcy against the Parksley Realty Company. This proceeding was contested on the ground that the Realty Company was solvent. The issue was submitted to a jury in the Federal court and a verdict declaring the Realty Company insolvent was returned. A judgment declaring the Realty Company insolvent would have rendered invalid the judgment lien the bank held for $9,500 against the Realty Company, the assignment to the bank of the $8,000 claim allowed the Realty Company against the Chandler estate, and the assignment to the bank of a $4,000 note executed by Benjamin to the Realty Company. In other words, a judgment in bankruptcy would have invalidated all the liens and assignments which the bank held as security for the payment of the $9,500 loan, and all creditors of the Realty Company would have shared *pro rata* in the liquidation of the company's assets.

The combined unimpaired capital stock and surplus of the bank was $90,000. A loan to any one person of more than 10% of this amount was a violation of the statute.

At this time the assets and liabilities of the Realty Company appear to have been as follows:

### ASSETS

| | | |
|---|---|---|
| Mason building, purchase price and repairs. | $30,500 | |
| Hurst building | 4,500 | |
| Vacant lot on which post office was built.. | 5,000 | |
| Total cost of real estate............. | | $40,000 |
| Claim proven against Chandler estate...... | $ 8,000 | |
| Benjamin note for rent................. | 4,000 | |
| | | 12,000 |
| Total assets ....................... | | $52,000 |

### LIABILITIES

| | | |
|---|---|---|
| Note held by bank..................... | $ 8,000 | |
| Account due bank for purchase price of vacant lot .......................... | 1,500 | |
| C. B. Ross for money borrowed.......... | 10,000 | |
| A. J. Rew for money borrowed.......... | 3,000 | |
| Stock issued and outstanding............ | 15,000 | |
| Total liabilities.................... | | $37,500 |

No stock had been issued to Chandler and apparently none would have been issued until the $8,000 indebtedness to the bank was paid.

The directors, confronted with this situation, decided to acquire the Ross and Rew judgments against the Realty Company. S. C. White, cashier of the bank and secretary of the Realty Company, paid C. B. Ross $6,500 and in return

received an assignment to the bank of his $10,000 judgment and an assignment of his stock of the par value of $1,500 in the Parksley Realty Company. White paid Rew $1,950 and in return received an assignment to the bank of his $3,000 judgment and an assignment of his stock of the par value of $5,000 in the Parksley Realty Company. For this expenditure of $8,450 the bank obtained judgment liens of the face value of $13,000 and an assignment of stock of the Realty Company of the par value of $6,500. The bankruptcy proceedings against the Realty Company were dismissed. The effect of the dismissal of the bankruptcy proceedings was to make the $9,500 judgment against the Realty Company a first lien on all of its real estate and to make valid the assignments of the Chandler obligation of $8,000 and the Benjamin note of $4,000 to the bank.

White's acquisition of the Ross and Rew judgments and of the assignments of stock seems to have been formally reported to the board of directors on March 1, 1938, and was approved by the following resolution: "On motion duly seconded, to make Parksley Realty Company an additional loan of $8,450 by delivery of judgments assigned, C. B. Ross $10,000, A. J. Rew $3,000, as collateral, in order to keep the company from being forced into bankruptcy, thereby making it compulsory upon the bank to purchase the real estate in order to protect itself before it can possibly collect the collateral it now has, namely, $8,000 approved by the Circuit Court against J. W. Chandler Estate, and Benjamin's account $4,000."

The loan was evidenced by a simple promissory note payable to the bank and signed by the Realty Company for $8,450. This amount was deposited to the credit of the Realty Company, and checks were made payable to Ross and Rew, and presented to the bank and paid out of this deposit.

The transaction in the resolution adopted by the directors is called "*an additional loan*" to the Parksley Realty Company. The Ross and Rew judgments were expressly de-

clared to be held by the bank as "collateral" to secure the payment of the sum advanced.

In *Smith* v. *Coleman, ante,* pp. 259, 270, 35 S. E. (2d) 107, we quoted with approval from *Barbin* v. *Moore,* 85 N. H. 362, 159 A. 409, 415, 83 A. L. R. 62, 73, as follows: " 'Collateral means secondary or subsidiary. Such security is to be resorted to only in the event that the pledgor fails to perform the principal contract. A pledge as collateral security *ex vi termini* excludes the idea that the thing pledged is designed as the primary source from which payment is to be made.' "

If the transfer of an instrument is made merely as collateral security for the payment of a debt contracted at the time or for a preexisting debt, the transferee is the holder for value only to the extent of the amount of the debt. *Payne* v. *Zell,* 98 Va. 294, 36 S. E. 379.

The note for $8,450 was entered on the books of the bank as any other loan. It was carried as a loan from the time it was given until the bank was closed. Title to the realty did not pass to the bank. The Realty Company had the right at any time to sell the three lots, pay the bank the amount of the two obligations, $17,950, and retain the balance of the purchase money for the benefit of its own stockholders. The bank's recovery from the Realty Company was at all times limited to the amount of its two obligations. Every element of the transaction bears the earmark of a loan and not a purchase.

Under these circumstances, the trial court was correct in refusing defendants' instructions A and B, which were based on the theory that the bank purchased the Ross and Rew liens for the exclusive benefit of the bank.

Plaintiff's first assignment of error is to the modification of its instruction numbered 1. The instruction, with the objectionable language italicized, is as follows:

"The Court instructs the jury that National Banks are prohibited by law from permitting the obligations of any one corporation held by the bank exceeding 10% of the capital and surplus of the bank, and in case of the violation

of this prohibition all directors of the bank who knowingly participated in or assented to such violation are personally liable for all damage resulting from such violation, regardless of the purpose, intent or motive of the directors in violating this provision.

"You are further instructed that in this case the use of the sum of $8,450 of the bank's funds on February 9, 1938, for the purpose of making a loan to the Parksley Realty Company, or for the purpose of purchasing the Rew and Ross judgments against that company constituted *an excessive loan*, and that all of the directors in this action, as directors of the Parksley National Bank, having participated in and assented to this transaction are liable to the plaintiff for all loss arising therefrom."

The first paragraph of the instruction told the jury in express terms that the granting of the loan of $8,450 was a violation of a Federal statute, and the use of the words "excessive loan" instead of "a violation of law" did not change the meaning of the instruction and could not have misled the jury.

Plaintiff's second assignment of error is based on the refusal of the court to instruct the jury that the receiver had the right to apply the collections from the assets of the Realty Company on either or both notes as it "saw fit."

It is conceded that the primary object of the directors in making the $8,450 loan to the Realty Company was to obtain control of all the assets of the Realty Company and thereby secure the payment of the $9,500 note. The cost price of the real estate involved was $40,000, and the face value of the other two claims owned by the Realty Company was $12,000, making a total of $52,000. By this deal the bank became the only creditor of the Realty Company and reduced the total amount of the Realty Company's debts from $22,500 to $17,950.

Under normal conditions, this action of the directors would have inured to the benefit of the bank and saved it from all loss. However, the depression seems to have been more severe and to have lasted longer on the Eastern Shore

than it did in any other section of the State. Failure of other banks and other business concerns forced the value of real estate to the lowest ebb in the modern history of the Eastern Shore. The directors of this bank, as well as the directors of banks in all sections of the State, were making strenuous efforts to prevent failures and losses to creditors and stockholders. The Parksley National Bank took over the management of the Realty Company, paid the taxes and insurance on the buildings, collected rents and dividends from the Chandler estate and applied them on the obligations due the bank. The National Bank examiners and the examiners for the Federal Deposit Insurance Corporation made several examinations of the bank after the note had been accepted and before the doors of the bank were closed. They were fully informed of the transaction and made no objection or criticism of the manner in which the bank had made the loan and prevented the Realty Company from being declared a bankrupt.

Notwithstanding the evident good faith of the directors, the additional loan of $8,450 to the Realty Company was a violation of the Federal statute and the directors who assented to such violation became liable for the actual loss sustained.

Under the statute, it was the duty of the directors to restore the bank to the same financial status it possessed immediately before the excessive loan was made. It would be unjust and inequitable to permit the receiver to retain all benefits derived from the transaction and place all losses on the directors. In *Corsicana Nat. Bank* v. *Johnson, supra,* at p. 87, it is said: "Whatever of value the Bank recovered from the borrowers on account of the (excessive) loan would go in diminution of the damages." If the directors had taken no action in the bankruptcy proceedings, the Realty Company would have been declared a bankrupt and all creditors would have shared *pro rata* in the liquidation of its assets—that is, the bank would have received approximately 42% of the net proceeds realized from these assets. The net amount

collected by the receiver for the sale of the real estate was $6,058; from the Chandler estate $2,356.10; and from a compromise settlement of the Benjamin note $1,347.28. The bank collected on the Chandler acount prior to receivership $1,896. The first payment, $800, was collected on December 31, 1937, while the bankruptcy proceedings were pend-·ing. It follows that the other creditors had a right to attack the validity of this payment in the event the debtor was declared a bankrupt. The total sum thus collected from the liquidation of the Realty Company's assets by the bank and the receiver was $11,657.38. Forty-two per cent., or $4,896.10, should have been credited on the $9,500 indebtedness, and $6,761.28 credited on the $8,450 note. The difference, $1,688.72, seems to be the total loss sustained by the action of the directors in making the excessive loan of $8,450 to the Realty Company.

It follows that the court committed no error in refusing to instruct the jury that the receiver had an arbitrary right to credit the sums collected from the assets of the Realty Company as it "saw fit."

The amount of loss stated above is based on the contention of the plaintiff that it was within its rights when it accepted $1,347.28 for the Benjamin note of $4,000 with several years' accrued interest. The defendants introduced evidence tending to show that this note could, and should, have been collected in full. On this conflict in testimony, the court granted two instructions; one on the request of the plaintiff and the other on the request of defendants. These instructions are as follows:

## Instruction No. 2.

"The Court instructs the jury that in accepting a settlement of $1,347.28 on the obligation of Benjamin's account to the bank the receivers are presumed to have acted in good faith and to have collected as large an amount as possible, and the burden of proof is upon the defendants to show

by a preponderance of evidence that a larger amount should have been realized by the receiver."

### Instruction D

"The Court instructs the jury that if you believe the plaintiff compromised the Benjamin note without the consent of the defendants, and further believe that said Benjamin could have paid said note in full or a greater part thereof than was accepted in compromise then the defendants are entitled to receive credit for such additional amount as could have been collected on the said Benjamin note over the amount settled for."

Plaintiff objected to defendants' instruction D on the sole ground that it did not repeat the identical statement made in instruction 2 regarding the burden of proof. The doctrine of the burden of proof was fully covered in plaintiff's instruction dealing with the same issue, hence it was entirely unnecessary to reiterate it in defendants' instruction.

Plaintiff realized that whether or not it should have collected the Benjamin note in full was an important issue in the case. The trial court, on its request, submitted the issue to the jury, and the jury, by its verdict, found that this note could, and should, have been collected in full. If this had been done, there would have been no loss to the bank from the action of the directors in making the excessive loan.

Plaintiff further contends that the trial court committed an error in its refusal to set aside the verdict because of the misconduct of the jury.

After the court had accepted the verdict and discharged the jury, and after the court had overruled the motion for a new trial, there was found among the papers in the case a yellow sheet of paper on which was written the following: "Inasmuch as the bank examiners and the F. D. I. C. examiners did not recognize the $8,450 loan to be illegal, by not warning the bank nor requesting immediate liquidation, nor taking legal action; the jury believe the transaction was legal and the bank incurred no damage."

No one knows the origin of this paper. Plaintiff assumes that it was written by one of the jurors, but this is not proven. Even if it were proven, the statement could not be considered. Jurors are not permitted to explain their verdict by stating the reasons upon which their conclusions are based.

Mr. Justice Browning, in *Norfolk, etc., R. Co.* v. *White*, 158 Va. 243, 163 S. E. 530, said: "In our judgment the court correctly refused to receive and read the affidavits of the jurymen to impeach their verdict. As we understand it, this is permitted by the courts only in cases involving some misconduct upon the part of a juryman or jurymen."

In *Dartnell* v. *Bidwell*, 115 Me. 227, 98 A. 743, 5 A. L. R. 1320, 1324, this is said: "The testimony of jurors concerning their deliberations and proceedings is not admissible. It is not competent for a juror to testify what did or did not influence him."

The plaintiff, in its eighth assignment of error, contends that the verdict should be set aside and a new trial granted because a colloquy which occurred between a witness and one of the jurors "was very prejudicial" to it.

After both sides had completed the introduction of their evidence and before the court had passed upon the instructions, a member of the jury asked the court a question in regard to the $8,450 note. The court, without objection from either side, called Mr. White, one of the defendants, to the stand. The juror asked him a number of questions. Finally, plaintiff stated: "If your Honor please, I think we are getting into matters of law." Thereupon the court directed the juror to confine his inquiries to questions of fact. The only ruling made by the court was favorable to the plaintiff and in accord with its suggestion. There is no adverse ruling of the trial court and no exception of the plaintiff upon which to base an assignment of error for consideration by this court. (See Rule of Court No. 22.)

We find no reversible error in the record, therefore, the judgment of the trial court is affirmed.

*Affirmed.*