FEDERAL DEPOSIT INSURANCE CORPORATION, Receiver of the First National Bank of Marlin, Marlin, Texas, Plaintiff-Appellee,

v.

The AETNA CASUALTY AND SURETY COMPANY, the Travelers Indemnity Company, and United States Fidelity and Guaranty Company, Defendants-Appellants.

No. 27254.

United States Court of Appeals, Fifth Circuit.

April 13, 1970.

Rehearing Denied and Rehearing En Banc Denied July 30, 1970.

R. T. Bailey, James A. Williams, Bailey, Williams, Weber & Allums, James A. Knox, Dallas, Tex., Elmer W. Beasley, Hartford, Conn., Cullen Smith, Waco, Tex., for defendants-appellants.

Frank L. Skillern, Jr., Royal H. Brin, Jr., Dallas, Tex., Douglas Boyd, Waco, Tex., John J. Slocum, Leslie Fisher, Federal Deposit Ins. Corp., Washington, D. C., James W. Duvall, Federal Deposit Ins. Corp., Marlin, Tex., for plaintiff-appellee.

Before THORNBERRY, GODBOLD and MORGAN, Circuit Judges.

LEWIS R. MORGAN, Circuit Judge.

This is an appeal from a judgment for the plaintiff, Federal Deposit Insurance Corporation (hereinafter, the FDIC), rendered by the District Court for the Northern District of Texas, sitting without a jury, in an action seeking indemnity under two banker's blanket employee fidelity bonds and an excess bank employee dishonesty bond (hereinafter, the bonds) which were executed and delivered by the defendant insurance companies to the First National Bank of Marlin, Texas (hereinafter, the Bank) for a loss sustained from the purchase by the Bank of 101 real estate notes (hereinafter, the notes) in violation of the National Banking Act, 12 U.S.C. § 21 et seq., alleged to have been caused by the dishonest and fraudulent acts of persons whose acts were covered under the bonds.

On February 7, 1962, The Travelers Indemnity Company executed and delivered to the Bank its Banker's Blanket Bond, Standard Form 24, for $40,000. On December 28, 1961, United States Fidelity and Guaranty Company executed and delivered to the Bank its Banker's Blanket Bond, Standard Form No. 2, for $80,000, subject to a deductible of $40,-000. On May 10, 1963, The Aetna Casualty and Surety Company executed and delivered to the Bank its Excess Bank Employee Dishonesty Blanket Bond, Standard Form No. 28, for $1,000,000, subject to a deductible of $120,000. All three of the bonds continued in force until the Bank was closed on March 10, 1964. In all three bonds, the insurance companies agreed to indemnify the Bank against any loss sustained through the dishonest or fraudulent acts of any em-

ployee, as that term is defined in the bonds.[1]

Each of the bonds provides under the heading "Exclusions":

Section 1. This bond does not cover * * * (c) Any loss resulting from any act or acts of any director of the Insured other than one employed as a salaried, pensioned or elected official or an Employee of the Insured, *except when performing acts coming within the scope of the usual duties of an Employee,* or while acting as a member of any committee duly elected or appointed by resolution of the board of directors of the Insured to perform specific, as distinguished from general, directorial acts on behalf of the Insured. (Emphasis supplied.)

The events leading up to the purchase of the bonds began with the acquisition of a controlling interest in the Bank by Joseph B. Morris and Bernard S. Garrett, through their agent Matthew D. Steiner, on July 18, 1963. The Continental Bank and Trust Company of Houston, Texas, agreed to finance the purchase of the stock on the condition that Morris and Garrett would not be stockholders of record. Consequently, the stock was purchased in the names of Steiner; his wife, Mary Jo Steiner; Vince Sanfilippo; and the Republic National Finance Company, which was organized by Morris and Garrett as their alter ego and instrumentality and had Steiner as its president and chairman of its board of directors. Steiner, his wife, Sanfilippo and Republic National all made declarations of trust, wherein they agreed to hold the shares of the Bank's stock registered in their names in trust for the benefit of Morris and Garrett. On July 17, 1963, Morris and Garrett instructed Steiner to go to Marlin, Texas, in order to consummate the purchase of the Bank's stock and to call a meeting of the Bank's board of directors and have himself, his wife and Sanfilippo elected as directors in order to control the Bank. This was done by Steiner on July 19th.

On September 6, 1963, Morris and Garrett agreed through their agents, Goree Mock and Brown Walker, doing business as Liberty Realty Company, to purchase certain notes and mortgages with unpaid balances totalling $1,001,382 from the First American Life Insurance Company, Houston, Texas, and further agreed to deposit the approximate amount of $1,000,000 with the San Jacinto Title Company to be disbursed by First American and in accordance with separate disbursing instructions from Liberty Realty.

On September 11, 1963, the Bank's board of directors passed upon Steiner's motion, a resolution authorizing the Bank to accept a deposit of $500,000 from the Guaranty Depository of California and $500,000 from the Mainland Bank and Trust Company of Texas City, Texas, which was controlled by Morris

---

[1]. The *Travelers bond* provides:

(A) Any loss through any dishonest, fraudulent or criminal act of any of the Employees, committed anywhere and whether committed alone or in collusion with others, including loss of Property through any such act of any of the Employees.

The *U.S.F. & G. bond* provides:

(A) Through any dishonest act of any of the Employees committed anywhere and whether committed alone or in collusion with others.

The *Aetna* bond provides:

* * * through any dishonest, fraudulent or criminal act committed anywhere by any of the Employees, acting alone or in collusion with others * * *

Each of the bonds define the term "Employee" in essentially the same language:

Wherever used in this bond, Employee and Employees shall be deemed to mean, respectively, one or more of the Insured's officers, clerks and other employees while employed in, at or by any of the Insured's offices while covered under this bond, and attorneys retained by the Insured to perform legal services for the Insured and the employees of such attorneys while such attorneys or the employees of such attorneys are performing such services for the Insured, and Guest Students pursuing their studies or duties in any of said offices.

and Garrett and had Steiner as its president and chairman of its board of directors, and to invest a like amount in Houston real estate notes.[2] Steiner made this motion pursuant to instructions given him by Morris and Garrett. At the time of the September 11th meeting, Steiner told J. J. Gallaher, Jr., the Bank's president, that he had applied for a charter for a savings and loan association and that when the charter had been granted he would transfer the notes and mortgages to the savings and loan association, so that they would remain in the Bank only a short time. In reply, Gallaher informed Steiner that the Bank was a national bank and that under the National Banking Act, supra, it could not take any one loan in excess of $20,-000 with a maturity date in excess of twenty years.

On September 18, 1963, Steiner conferred with Norman R. Dunn, Deputy Comptroller of the Currency of the United States, in Dallas, Texas, and informed him that he was acting as a front for Morris and Garrett in that they were the beneficial owners of the stock registered in the names of Steiner, his wife, Sanfilippo, Roger Harrold and Republic National. This information, however, was never made available to the minority members of the board of directors or to the Bank's officers. Dunn, in turn, instructed Steiner that no assets were to be purchased by the Bank which were out of the Marlin trade area, and the Bank was not to be involved in any transaction with Morris or Garrett or their business interests. These instructions were, likewise, never conveyed to the minority members of the board or to the Bank's officers.

On October 3, 1963, the Bank's board of directors passed a resolution authorizing The Riverside National Bank of Houston to purchase first lien real estate notes for the Bank's account subject to the approval of Steiner.[3] Two letters, one on October 2nd and one on October 3rd, were written to The Riverside National Bank by Gallaher, as president of the Bank, and both these letters stated that the purchase of the notes was to be subject to the approval of Steiner.[4] Although The Riverside National Bank did not purchase the notes mentioned in the October 3rd resolution nor service the notes that were eventually purchased by the Bank, the uncontradicted testimony indicates that the notes Steiner was authorized to approve by the October 3rd resolution and the notes that were eventually purchased were identical. Pur-

2. The Minutes of the Directors' Meeting of September 11, 1963, read in part:
On motion of Matt Steiner seconded by Roger Harrold and carried, the Bank was instructed to accept $500,000.00 in Certificate of Deposits from The Guaranty Depository to pay 4% Interest for one year. The Mainland Bank & Trust Company of Texas City will deposit $500,000 without Interest for the same length of time. This money will be invested in Houston Real Estate Notes at 6 to 8% interest. None of the notes will be over our limit of $20,000.-00 and will be bought at a discount of $5,000.00. The amount of the notes will be around $1,000,000.00. The R/E notes are subject to approval of our Attorneys. The Bank has entered into contract with Valley National Corp. of Houston to collect and service the notes for 1%.

3. The Minutes of the Board meeting of October 3, 1963, read, in part, as follows:

That the Riverside National Bank of Houston is to purchase for the account of this bank first lien Real Estate notes subject to the approval of Mr. Matt Steiner, Chairman of the Board of The First National Bank, Marlin, Texas.
The Riverside National Bank of Houston, Texas, is to service the notes for 1% service charge.

4. The letter of October 2nd stated: "We are willing to purchase $1,000,000 in Real Estate 1st Lien Notes from you. We will allow you 1% for servicing these notes. Our Chairman of the Board, Mr. Matt Steiner, will handle the transaction." The letter of October 3rd refers to a telephone conversation and states: 'This is your authority to purchase for our account the above mentioned notes subject to the approval of our Chairman of the Board, Mr. Matt Steiner, who will approve notes for this Bank." The letter also mentioned servicing the notes and the October 3rd resolution.

suant to this authority and upon instruction from Morris and Garrett, Steiner went to the San Jacinto Title Company on October 5, 1963, and examined the notes for delinquency. Steiner testified that he merely checked notations that had been made on the outside of the packets containing the individual notes and mortgages, and at no time scrutinized the notes to ascertain whether they conformed to the requirements established for the National Banking Act, supra, as they applied to the Bank.

On October 7, 1963, Morris and Garrett sent Sanfilippo to the Bank to pick up a cashier's check for $970,000 with which to purchase the notes. While Sanfilippo was at the Bank, Steiner, who was in Houston, had a telephone conversation with Gallaher, the Bank's president, during which Steiner told Gallaher that an attorney in Houston had checked the titles to the mortgaged property for the Bank, while, in fact, no attorney had done so, and instructed him to issue the check. Sanfilippo returned to Houston and delivered the check to Morris and Garrett, but it is unclear who delivered the check to the San Jacinto Title Company.

Steiner was not involved in any of the negotiations leading to the purchase of the notes, and he was present at the closing of the transaction at the offices of the San Jacinto Title Company on October 8, 1963, only for about the last ten minutes. At this time Steiner signed a document which on its face purports to be a "Purchaser-Borrower Statement" and which is referred to in the testimony as the closing statement. Although Steiner's signature does not indicate in what capacity he signed, he was the only representative of the Bank present at the closing. On October 9, 1963, Steiner personally delivered the notes and mortgages to the Bank, along with checks drawn by San Jacinto for $22,319.26 and $1,878.60 after closing the deal, the first representing the Bank's discount on the notes, the second the difference between the purchase price and the $970,000.

Out of the $968,121.40 paid to San Jacinto, $189,186.04 was paid to Valley National Mortgage Company, a Morris-Garrett front, as the "net discount realized" in the purchase, and this money ultimately ended up in the hands of Morris and Garrett. Steiner testified that he observed that the closing statement reflected that Valley National was to receive this amount out of the transaction and that he knew Valley National to be a front for Morris and Garrett. He further testified that he was told by Morris and Garrett that the money was to be used to set up reserves to insure the currency of the notes, to move the notes when the federal savings and loan association charter was obtained, and to pay money brokers' commissions for the deposits that had been procured for the Bank. Steiner also testified that he felt the purchase of the notes violated the instructions given him by the Deputy Comptroller of the Currency. Steiner never informed the minority directors or the Bank's officers of the payment to Valley National.

When the notes were delivered to the Bank on October 9, 1963, by Steiner, a Mr. Donohoo, a director, vice president and cashier of the Bank, looked at several of the notes and informed Steiner and Gallaher that they did not conform to the requirements of the National Banking Act, and if all the notes were of a similar quality they would have to be returned. Also, on October 9th, a meeting of the Board of Directors was held, at which the purchase of the notes was approved.[5] On or about October 18 or

5. The Minutes of the October 9th Board of Directors' Meeting read, in part, as follows:

Minutes of Meeting September 11th and October 3rd were read and approved.

&ast; &ast; &ast; &ast; &ast;

Referring to Minutes of September 11th and October 3rd wherein we recorded in the minutes two different Banks were to service Real Estate Notes for 1% that we were purchasing, Chairman of the Board Mr. Matt Steiner made a deal with the Medical Center

20, 1963, President Gallaher completed an examination of the notes in detail and found that three exceeded the Bank's $20,000 limit and that sixty-four were for periods of time exceeding the Bank's twenty-year limit. Gallaher immediately informed Steiner that the notes were nonconforming and that Steiner would have to get the notes out of the Bank, and that if they were discovered by the bank examiners, the Bank would be closed. Steiner promised to get the notes out of the Bank and the evidence indicates that, while he made diligent efforts to place the notes elsewhere, he failed to do so.

In February, 1964, Deputy Comptroller of the Currency Dunn became aware of the nonconforming quality of the notes and gave the Bank a short time in which to dispose of them. At a Board of Directors' meeting held on February 24, 1964, the resignations of Steiner, his wife and Sanfilippo were demanded and received. On March 10, 1964, the Bank was declared insolvent by the Comptroller of the Currency, pursuant to 12 U.S.C. § 191, and the FDIC was appointed receiver pursuant to 12 U.S.C. § 1821.

The Bank ultimately suffered a net loss upon the disposal of the notes of $408,362.97.[6]

The FDIC gave the insurance companies notice of loss by letter on March 18, 1964, and filed a proof of loss by letters dated August 5, 1964, after the insurance companies had extended the time in which proof of loss could be made. The insurance companies denied liability on August 12 and 14, 1964. The Bank gave no notice nor filed a proof of loss prior to its closing on March 10, 1964.

In its Finding of Fact and Conclusions of Law, the District Court found, *inter alia*: (1) that Steiner was given access to the original notes and mortgages in the offices of the San Jacinto Title Company prior to their purchase and that after a brief examination he knew that they violated the instructions given to him by the Deputy Comptroller of the Currency; (2) that Steiner told Gallaher that the notes had been checked by an attorney for the Bank when he instructed Gallaher to issue the $970,000 check to Sanfilippo knowing that the notes had never been checked by an attorney for the Bank; (3) that at the time he signed the purchaser's statement, Steiner knew that Valley National Mortgage Company was a Morris-Garrett front and that no members of the Board of Directors had knowledge of the payment of $189,186.-04 to Valley National out of the note transaction except Steiner and Sanfilippo; (4) that Steiner's acts in connection with the purchase of the notes were acts coming within the scope of the usual duties of an employee of the Bank; and (5) that Steiner's acts in connection with the purchase of the notes were dishonest and fraudulent. The District Court held as a matter of law: (1) that a loss resulting from the dishonest and fraudulent acts of a director, which acts come within the scope of the usual duties of an employee, are covered by the bonds issued by the insurance companies; (2) that the purchase of the nonconforming notes was not authorized by the Bank's board of directors nor did it ratify the dishonest and fraudulent acts of Steiner; and (3) that notice of loss and proof of loss was filed by the FDIC with each of the insurance companies within the time limits set

---

National Bank to do this service for one-half of one percent.

We sent Mr. Steiner a check for $970,000 to purchase Real Estate Notes in Houston, Texas. He purchased $968,121.40 worth of notes and returned the check for the difference of $1,878.60.

We, also, got a discount of $30,000 less accrued interest of $7,680.74 leaving a balance of $22,319.26 for which amount we received a check.

6. On June 25, 1964, the FDIC, as receiver, sold the entire package of 101 notes and mortgages for the sum of $503,700.00, realizing sale expenses of $8,300. The Bank had collected up to this time the aggregate sum of $42,039.17 on account of principal and interest due and payable on the notes and mortgages.

The District Court approved the sale and the amount so realized as the highest offer that could be obtained for the notes and mortgages.

by the bonds, and that no director or officer of the Bank not in collusion with Steiner knew of the wrongdoing until March 10, 1964.

The initial question presented by this appeal is whether Steiner's actions in connection with the purchase of the notes by the Bank come within the coverage provisions of the bonds. This question, in turn, must be reduced to three even more specific questions: (1) whether the dishonest and fraudulent acts of a director committed while performing acts which come within the scope of the usual duties of an employee are covered by the bonds; and, if so, (2) whether the District Court was correct in finding that Steiner's acts in connection with the purchase of the notes were dishonest and fraudulent, and (3) that his acts came within the scope of the usual duties of an employee of the Bank.

■ All three bonds cover any loss realized through the dishonest and fraudulent acts of any Employee, as that term is defined in the bonds. It is conceded, however, that Steiner was not an officer, clerk or employee of the Bank at any time between July 18, 1963, and March 10, 1964, and that he did not take part in the day-to-day operations of the Bank. Instead, the FDIC claims coverage under an exception in an exclusion clause dealing with the acts of directors, which provides:

> This bond does not cover * * * any loss resulting from any act or acts of any director of the Insured other than one employed as a salaried, pensioned or elected official or an Employee of the Insured, *except when performing acts coming within the scope of the usual duties of an Employee,* or while acting as a member of any committee duly elected or appointed by resolution of the board of directors of the Insured to perform specific, as distinguished from general, directorial acts on behalf of the Insured. (Emphasis supplied).

In its Conclusions of Law, the District Court held that "Loss from the dishon-

est and fraudulent acts of a director, which acts come within the scope of the usual duties of an employee, are covered by the bonds issued by the defendants herein". On the other hand, the appellants argue that the proper construction of the provision would limit coverage to the acts of a director who has at the same time an officer or employee of the Bank and, more precisely, to only those acts which "come within the scope of the usual duties of an Employee" and are authorized by the Board of Directors or by the proper officer. We cannot agree with the appellants' interpretation.

■ In construing fidelity bonds, courts follow the liberal rules applicable to insurance contracts. However, the bond cannot be extended by implication, or enlarged by construction beyond the actual terms of the agreement entered into by the parties. Great American Insurance Co. v. Langdeau, 379 S.W.2d 62, 65 (Tex.1964). Likewise, a contract of insurance as any other contract must be read as a whole and, where possible, effect given to the entire contract, American Casualty Co. of Reading, Pa. v. Myrick, 5 Cir. 1962, 304 F.2d 179, 184, and the language used in insurance policies is given its usual and popular meaning unless it is ambiguous or is shown that the parties intended it to have a special meaning. Northwestern National Life Insurance Co. v. Black, 383 S.W.2d 806 (Tex.Civ.App.1964). Furthermore, the purpose of an exception is to take something out of the contract which otherwise would have been included in it. American Casualty Co. of Reading, Pa. v. Myrick, supra.

Reading the controverted provision in the light of these rules of construction, it is apparent a general rule is established by the exclusion clause in question that the bond does not cover the loss resulting from the act of a director of the Insured unless he is "employed as a salaried, pensioned or elected official or Employee of the Insured". The remainder of the clause, however, establishes an *exception* to this general rule so that if a director is "performing acts coming

within the scope of the usual duties of an Employee, or while acting as a member of any committee duly elected or appointed by resolution of the board of directors of the Insured to perform specific, as distinguished from general, directorial acts on behalf of the Insured", those acts are within the coverage of the bonds. The District Court is correct in its construction of the provision.[7]

The District Court found as a matter of fact: (1) that, after a brief examination of the notes at the offices of San Jacinto Title Company prior to closing the deal, Steiner knew that they violated the instructions given him by the Deputy Comptroller of the Currency; (2) that Steiner told the Bank's president that the notes had been checked by an attorney for the Bank, knowing this to be untrue, in arranging for the issuance of the check to purchase the notes; and (3) that at the time he signed the purchaser's statement he knew Valley National Mortgage Company was to receive $189,186.04 and that Valley National was a front for Morris and Garrett. These findings are amply supported by the record. The Court further found that these acts were dishonest and fraudulent and were acts coming within the scope of the usual duties of an employee of the Bank.

■ In Great American Insurance Co. v. Langdeau, supra, the Texas Supreme Court has recently held that:

"To constitute fraudulent and dishonest conduct, the employee must have some degree of intent to perform the wrongful action. There must be the physical act plus the mental state for there to be fraud. (Citing cases.)

The intent need not be of the degree required for criminal conduct. (Citing cases.) On the other hand mere negligence, carelessness or incompetence is insufficient. (Citing cases.) If the employee has knowledge of and aids in concealing another person's wrongful conduct, it has been held that he, himself, is guilty of that same wrongful conduct. (Citing cases.)" 379 S.W.2d at 65.

Likewise, the words "dishonest" and "fraudulent" used in reference to conduct covered by the bond are to be given a broad meaning, Irvin Jacobs & Co. v. Fidelity & Deposit Co. of Maryland, 7 Cir. 1953, 202 F.2d 794, and both misrepresentation of facts and deliberate deception by pretense and stealth constitute dishonest and fraudulent conduct. National Surety Corp. v. Rauscher, Pierce & Co., 5 Cir. 1966, 369 F.2d 572, cert. den. 386 U.S. 1018, 87 S.Ct. 1375, 18 L. Ed.2d 456, and Maryland Casualty Co. v. American Trust Co., 5 Cir. 1934, 71 F. 2d 137, cert. den. 293 U.S. 582, 55 S.Ct. 95, 79 L.Ed. 678. Moreover, it is not necessary that the person covered by the fidelity bond personally profit by his acts. Irvin Jacobs & Co. v. Fidelity & Deposit Co. of Maryland, supra, 202 F.2d at 798.

■ In light of these principles, there can be no doubt that the District Court was correct in finding Steiner's conduct in connection with the purchase of the notes "dishonest and fraudulent". Steiner was first and always the agent of Morris and Garrett. His conduct only illustrates his disregard for the responsibilities he had to the Bank and his preoccupation with furthering the designs of Morris and Garrett. He acted

---

7. It is interesting to note, although it is in no way binding on this Court, that the apparent expectation in the industry concerning the Exclusion Clause is compatible with the construction reached here. In a discussion of bankers blanket bonds in Insurance and Protective Committee of The American Bankers Association, Digest of Bank Insurance, p. 5b, it is reported:

Losses caused by directors who are not salaried, pensioned or elected officials or employees are excluded from coverage under all three forms. On June 11, 1951, however, Forms 2 and 24 were amended *so as not to exclude losses resulting from acts of directors while they are performing the duties of employees or are acting as members of a committee* appointed by the board of directors to perform specific acts. Previously a rider was available to effect this amendment. (Emphasis added.)

for the interests of Morris and Garrett while he led the Bank to believe that he acted in its interest, and when these two sets of interests conflicted, he did not hesitate to keep information from the Bank which it had a right to know or to follow blindly the instructions of Morris and Garrett when, in the Bank's interest, he should have refused to do so.

■ Likewise, the District Court was correct in holding that Steiner's acts in connection with the purchase of the notes were "acts coming within the scope of the usual duties of an Employee". While it is true that a director exercises his office only through the collective action of the Board of which he is a member and that a director has no individual power of action as does an officer who is usually elected or appointed to perform specific duties as agent of the corporation by the Board of Directors, Georgia Casualty and Surety Co. v. Seaboard Surety Co., N.D.Ga.1962, 210 F.Supp. 644, 651, aff'd without opinion 5 Cir. 1964, 327 F.2d 666, there is nothing to prevent a board of directors from authorizing one of its members to act in an officer-like capacity for the corporation in a particular transaction. This is precisely what took place here. On October 3, 1963, the Board authorized the purchase of the notes in question "subject to the approval of Mr. Matt Steiner, Chairman of the Board of The First National Bank, Marlin, Texas," and it is uncontroverted that Steiner was the only person present to represent the Bank in the subsequent purchase transaction. The Board of Directors made it even more clear that Steiner was acting in an officer-like capacity for the Bank in the note transaction by its approval of his handling of the matter (insofar as the facts were known to the innocent members of the Board) in its resolution of October 9, 1963. Steiner was in no way a usurper of authority, as was the case in the *Georgia Casualty and Surety* case. Steiner's actions in connection with the purchase of the notes, with the exception of his participation in the actions of the Board of Directors which authorized the purchase, were acts coming within the scope of the usual duties of an officer of the Bank, a position included within the definition of "Employee" in the bonds. Steiner's actions in connection with the purchase of the notes were, therefore, within the coverage provided by the bonds. Furthermore, these actions resulted in the Bank's purchase of the nonconforming notes, the possession of which caused the Bank to be closed and resulted in the loss for which recovery is being sought here.

■ The second question presented by this appeal is whether the notice requirements of the bonds were met. Each of the bonds provide:

At the earliest practicable moment after discovery of any loss hereunder the Insured shall give the Underwriter written notice thereof and shall also within six months after such discovery furnish to the Underwriter affirmative proof of loss with full particulars.

The District Court held as a matter of law that "Notice was given by Plaintiff to each Defendant and the Proofs of Loss were filed by Plaintiff with each Defendant within the time limits set out in the Defendants' bonds, in that neither the Bank nor any director or officer not in collusion with the person in default had knowledge of the fact that Joseph Morris and Bernard Garrett received $189,186.04 from the transaction involved herein and the Bank did not know that Steiner had knowledge of this fact until on or about March 10, 1964". The appellants argue that notice was not given at the earliest practicable moment in that the Bank discovered the loss on October 9, 1963, when the Bank's cashier examined three of the notes and found that they did not conform with the requirements of the National Banking Act, supra, and that notice was not given until March 18, 1964. The appellants, however, are laboring under a misapprehension. The purchase of nonconforming notes, in and of itself, did not constitute the fraudulent and dishonest con-

duct upon which liability under the bonds is predicated. Rather, the fraud and dishonesty arose out of the fact that Steiner participated in the purchase of these notes knowing that their purchase would violate the instructions given him by the Deputy Comptroller of the Currency; misrepresented to the president of the Bank that an attorney for the Bank had passed on the bonds in procuring the issuance of the check for their purchase; and finally, and most importantly, that Steiner participated in the transaction knowing that Morris and Garrett were to receive $189,186.04 out of the purchase price of the notes and then failed to relay this information to the Bank. The word "loss" as used in the notice requirements of the bonds means the date the fraud was discovered by the Bank—not the date the Bank was called upon to make good the loss. Mount Vernon Bank & Trust Co. v. Aetna Casualty and Sur. Co., E.D.Va.1963, 224 F.Supp. 666 (construing an identical notice requirement). Thus, the "loss" here was not discovered when the nonconforming nature of the notes was discovered, but when Steiner's fraudulent conduct came to light after the Bank was closed and placed in receivership.

The fact that the nonconforming nature of the notes was discovered by the Bank in October of 1963, however, does raise the question whether the Bank was then placed on notice that the note transaction might involve something more than merely the purchase of nonconforming notes and was obligated to inquire further into the transaction and give notice of its suspicions to the insurance companies. The well-established rule is that the Insured under a blanket employee's fidelity bond is not bound to give notice "until he [has] acquired knowledge of some specific fraudulent or dishonest act which might involve the [Insurer] in liability for the misconduct". Notice is not required when the obligee merely suspects or has reason to suspect the wrongdoing. American Surety Co. v. Pauly, 170 U.S. 133, 144, 18 S.Ct. 552, 42 L.Ed. 977 (1898). Accord, United States Fidelity & Guaranty Co. v. Walker, 5 Cir. 1918, 248 F. 42. See 129 A.L.R. 1411 and 23 A.L.R.2d 1065. In other words, the Bank was not required to give notice to the insurance companies at the time the nonconforming nature of the notes was discovered even if it did have reasons to suspect wrongdoing. The District Court was, therefore, correct in holding that notice had been given within the time limits established by the bonds.

The appellants further contend that the loss is not within the coverage of the bonds because the purchase of the nonconforming notes was an act of the Bank, in that knowledge of the nonconforming nature of the notes is imputed to the Bank through the knowledge of its officers and directors and the information contained in its records and, in spite of this knowledge, the Bank ratified, approved and adopted as its own the purchase of the nonconforming notes, and that there is no coverage for the wrongful or dishonest act of the Bank under the bonds. This contention lacks merit for several reasons. First, the fraud consisted of Steiner's actions in connection with the purchase of the notes, not the purchase of the nonconforming notes as such. Secondly, the knowledge of Steiner and the directors associated with him cannot be imputed to the Bank since they were acting adversely to its interests. First Texas Joint Stock Land Bank v. Chapman, 48 S.W.2d 651 (Tex.Civ.App., 1932). Thirdly, the Board of Directors of the Bank lacked the power to authorize the dishonest and fraudulent acts of Steiner. Minor v. Mechanics' Bank of Alexandria, 26 U.S. (1 Pet.) 46, 7 L.Ed. 47 (1828).

The judgment of the District Court is affirmed.

Affirmed.

GODBOLD, Circuit Judge (dissenting).

I dissent on the issue of notice to the sureties.

I agree with my colleagues that the inquiry as to timeliness is one of fixing the point in time at which the bank ei-

ther discovered there had been fraud or received information sufficient to require it to investigate further. I agree that a mere suspicion of wrongdoing is not enough.

The wrongful acts sued on as breaches of the bond were alleged to be "certain dishonest, fraudulent and/or criminal acts" committed by Steiner, Morris, Garrett, and Gallaher. The complaint set out with considerable specificity the various acts done by each of these four in connection with the acquisition of the notes which caused this bank to close. A detailed history of the relevant acts and occurrences is set out in a stipulation of the parties which is some 150 pages long and contains numerous documents. The District Court, as its first finding, found as facts all facts stipulated (except any inconsistent with express findings.) The court found that the acts of Gallaher, the president of the bank, in connection with purchase of the notes and mortgages, were negligent but not dishonest, fraudulent or criminal. It entered the following findings concerning Steiner's acts:

Findings of Fact:

\* \* \*

12. Steiner's acts in connection with the purchase of the 101 promissory notes and mortgages involved herein were dishonest and fraudulent.

\* \* \*

14. The purchase by the Bank of the notes and mortgages involved herein resulted in the Bank's insolvency and its liquidation.

15. The dishonest and fraudulent acts of Steiner caused loss to the Bank of $408,362.97.

\* \* \*

19. No members of the Bank's Board of Directors, other than Steiner and Vince Sanfilippo, had knowledge of the dishonest and fraudulent acts of Steiner in connection with the purchase of the notes and mortgages in question, until on or about March 10, 1964, the day the Bank closed.

Conclusions of Law:

1. The dishonest and fraudulent acts of Steiner which resulted in loss to the Bank are covered by the bonds issued by Defendants herein.

\* \* \*

6. The Bank did not have notice of the dishonest and fraudulent acts of Steiner in connection with the transaction involved herein until on or about March 10, 1964.

The court also entered findings that Steiner knew the purchase violated the instructions given him by the Deputy Comptroller, knew that the notes and mortgages had not been checked by an attorney, and knew of the commission to Morris and Garrett.

The majority opinion treats the case as limited to the three selected acts of Steiner just above described. Affirmance is predicated on lack of knowledge or notice by the bank of those acts. The pervasive scheme carried out by Steiner, and the broad spectrum of other acts done by him in connection with the scheme, are treated as though of no consequence. The majority approach is the only way to sustain on appeal Conclusion of Law 6, which states there was no notice of "the dishonest and fraudulent acts of Steiner" until March, 1964.

The short answer to the majority analysis is that it simply is not what Findings of Fact 12, 14, 15 and 19, and Conclusion of Law 1 and 6, say. Repeatedly the District Court employed the phrases, "Steiner's dishonest and fraudulent acts," and "Steiner's dishonest and fraudulent acts in connection with the purchase of the notes and mortgages," without indication that they were limited to only three of the many things Steiner did.

However, even if one accepts the narrowing of findings by construction at the appellate level, then the District Court erred as a matter of law in failing to address itself correctly to the notice issue. The question of whether the bank had knowledge sufficient to quicken the necessity of notice to the sureties,

and when it acquired that knowledge, could not be considered in terms of only three selected acts of Steiner. The District Court made no finding that the acts of Steiner other than the three selected acts were *not* fraudulent, dishonest or sufficient to put the bank on notice. In my opinion, the other acts of Steiner *were* fraudulent and dishonest as a matter of law and were so fully revealed in the fall of 1963 as to require the bank to notify the sureties of what its officers and directors knew. I would reverse the case. But, as a minimum, it should be remanded to the District Court for it to consider the issue of notice to the sureties in context of *all* that Steiner did and to enter appropriate findings thereon.

I turn to the facts of what Steiner did and who knew about it.

The bank was a small bank in a small town. Marlin, Texas has a population of approximately 6,900. The bank had capital of $100,000 and surplus of $100,000. The 1962 Polk's Bank Directory shows it had deposits of $2,539,000 and loans of $1,110,000. At that time there were three banks in Marlin.

Sale of controlling interest to new owners was made known to the directors on July 18, 1963. Immediately Steiner, his wife, and his associate Sanfilippo, were elected directors and Steiner Chairman of the Board.

On its face, Steiner's scheme was a rank impropriety from the beginning. The opening act was the directors' meeting of September 11. Steiner, a stranger to the bank and a spokesman for new interests in control approximately 20 days, brought to the board his three-pronged proposal.

—The bank would accept one-year deposits of $500,000 from Guaranty Depository (a California bank) and $500,000 from Mainland Bank of Texas City, Texas.[1]

—These funds were to be invested in notes secured by real estate mortgages.

—Steiner represented to President Gallaher that he "had an application for a savings and loan company to be in Houston." The bank would hold the loans only a short time after which "they would be transferred to the savings and loan in Houston."

Thus before the scheme was effectually launched it was revealed that it embraced self-dealing of stranger Steiner in his capacities as new Chairman and as spokesman for a nonexistent savings and loan association. The bank was to be a "warehouse" for the loans.

Both before and at the September 11 meeting Gallaher warned Steiner that under the National Banking Act the bank could take no loan in excess of $20,000 or over 20 years duration and that it preferred not to go over 15 years. 12 U.S.C. § 84 limits the obligation of a borrower owed to a national bank to 10 per cent of capital stock and 10 per cent of surplus. Thus this bank had a $20,000 loan limit. A loan in excess of the statutory limit is an illegal loan. Anderson v. Akers, 11 F.Supp. 9, 12 (W.D. Ky.1935); Federal Deposit Ins. Corp. v. Mapp's Executor, 184 Va. 970, 37 S.E.2d 23 (1946). 12 U.S.C. § 93 is the penalty section. If the directors knowingly violate or permit violation of § 84 the charter of the bank is forfeited and, after suit in federal court establishing the violation, the bank may be dissolved. Every director who participates or assents is liable in damages to the bank, its stockholders and others. The testimony referred to a 20-year limit for loans on improved real estate. This limit (now 25 years, by a subsequent amendment) is governed by 12 U.S.C. § 371. The important thing is that 20 years was a limitation imposed by law and not merely bankers' policy or a bank examiners' nicety.[2]

---

1. The deposits were procured by deposit brokers for a fee. Whether the board knew this is not shown.

2. Sections 84 and 371 forbid the existence of a loan not meeting the statutory standards. Whether the loan is "made" or "purchased" from a transferor is immaterial.

At the same time Gallaher told Steiner that the loans must be examined and approved by the bank's attorneys, a firm in Marlin.

At the September 11 meeting a resolution was adopted, on Steiner's motion, instructing the bank to accept the deposits and invest the money in approximately $1,000,000 of real estate notes, none over the $20,000 limit.[3] The resolution provided: "The R/E notes are subject to approval of our Attorneys."

It took no crystal ball for all the directors to see on September 11 the course of action on which the bank was embarking. If in 12 months the deposits were withdrawn and the bank still held the notes it would have to sell them or be exposed to a high risk of closing its doors. The bank was committed to a lack of liquidity which could become critical in 12 months, subjecting it to the vagaries of market conditions at that time governing salability of nonliquid investments.

There were two hedges against this freezing of a million dollars of assets. One was Steiner's oral promise that the loans wouldn't be around long and would be transferred to a nonexistent savings and loan association. No one knew if the association would ever come into existence, or if it did that Steiner's representation would be binding on it, or if it would possess a million dollars to buy the loans. There were none of the usual protective accompaniments of a "warehouse" transaction—no firm, written and enforceable commitments from a financially stable institution to purchase or "take out" the warehoused loans under agreed terms, at an agreed price and within a fixed period.

The second hedge was that if Steiner's promise was illusory, the investments could be disposed of on the mortgage market at, hopefully, no loss. This possibility was, at best, no better than the legality and quality of the loans to be purchased.

Judge Hutcheson, speaking for this Circuit, has described the coverage afforded against acts of bank officers by a fidelity bond for "dishonest acts."

Insurance against dishonest acts is insurance of fidelity; it is intended to, it does, guarantee openness and fair dealing on the part of the bank's officers. It is intended to, it does, underwrite that the bank's officers shall act with common honesty and an eye single to its interests. It guarantees that the bank shall at all times have the benefit of the unbiased, critical, and disinterested judgment of the president in regard to the loans it makes. It specifically guarantees that the president of a bank will not engage in secret operations for speculative profit, with the bank's money, by making pretended loans to others, these others, only means to his prohibited ends. In the transaction in question, the bank not only did not have the benefit of Ikard's critical and disinterested judgment, it was deliberately deceived by his pretense and stealth. Under the plainest principles of ordinary common honesty and fair dealing, his conduct was dishonest.

Maryland Casualty v. American Trust, 71 F.2d 137, 138 (5th Cir.) cert. den. 293 U.S. 582, 55 S.Ct. 95, 79 L.Ed. 678 (1934). On the face of the matter, Steiner was not acting "with common honesty and an eye single to its [the bank's] interests." I would hold that on September 11 there was sufficient knowledge or notice to "justify a careful and prudent man in charging another with fraud or dishonesty." Hidden Splendor Mining Co. v. General Ins. Co. of America, 370 F.2d 515 (10th Cir. 1966). And September 11 is only the beginning.

Later in September the bank received the deposits from Mainland and Guaranty and issued to each a one-year certificate of deposit. This was not all the "hot" money that the bank was getting. Between September 12 and 16 it re-

---

3. Gallaher's warning embraced both the $20,000 and the 20-year limits. The resolution referred to only the $20,000 limit.

ceived other deposits, made under one-year certificates of deposit, from 21 savings and loan associations in eight states, totaling $480,000.

One of the bank's hedges against risk of catastrophe was Steiner's promise. On October 3 the bank delegated to him control of the other hedge, the validity and quality of the loans. By resolution the directors authorized that the loans be purchased for the account of the bank by Riverside National Bank of Houston "subject to the approval of Mr. Matt Steiner, Chairman of the Board." Making loans and investments was the president's duty. Nevertheless the board turned over this million dollar loan transaction to the inexperienced stranger who had brought the deal to the bank.

On October 7, when Gallaher signed a draft to pay for the loans he questioned Steiner about whether the loans would be confirming assets [i. e., in conformity with banking laws and regulations.] He reminded Steiner of the necessity of their being passed on by the bank's attorney. Steiner told him they would be passed on by an attorney in Houston. This violated the resolution of September 11 and the instructions which Gallaher had given Steiner on that date.

On October 9 when Steiner delivered the notes to the bank, and prior to the meeting of that date, Donahoo, a director, vice president and cashier, looked at several of the notes at random and told Steiner and Gallaher that they did not conform to requirements of the National Banking Act, and if all the notes were of this quality "that they may as well take them back," because they "were not worthy to bring in the bank." Gallaher did not look at the loans at that time. However, he did discuss with Steiner whether they had been approved by a Houston attorney, and Steiner told him

they had been. The minutes of the October 9 meeting[4] referred to the purchase of the loans. Gallaher says it was discussed but that nobody had any questions about it. Gallaher considered that by approving the minutes of the two previous meetings, September 11 and October 3, the directors were approving the transaction.

Thus, before beginning of the meeting at which Steiner's acquisition of the loans was approved, President Gallaher and Vice-president and Cashier Donahoo knew that some of the loans violated the law. Also, on October 9, Gallaher knew his instructions and the board's instructions concerning approval by the bank's attorney had not been followed. And he learned that same day that Steiner had not purchased the loans through the Riverside National Bank, as authorized on October 3, but elsewhere.

Over the next ten days to two weeks —still in October—Vice-president and Cashier Donahoo went through the notes. He saw that they "represented an extremely bad deal for the bank." He found that of the 101 loans purchased probably 13 "might qualify" under the National Banking Act. Sixty-four[5] violated the Act by having more than 20 years to run. Three violated the Act by exceeding the $20,000 loan limit. Twenty or 21 more were nonconforming for reasons not specifically spelled out. Gallaher states that some of the loans exceeded the allowable 70 per cent of appraised value of the property, a violation of § 371.[6]

One of the three loans violating the $20,000 limit was for $108,303.43, some $88,000 over the maximum allowed by the Act and the amount authorized on September 11. The other two were $28,238.31 and $21,574.54. These excess loans totaled $158,116.28.

---

4. See footnote 5, majority opinion, for extract.

5. Actually, the schedule of the loans shows sixty-five.

6. The District Court found that 84 of the notes and mortgages were nonconforming assets and only 17 were legal investments. The difference between 84 as found by the District Court and the numbers testified to by the bank officers is not material.

The 65 loans violating the 20-year limit totaled $690,428.23.

The excess and over-length loans together totaled $848,544.51.

This is not all that Donahoo (and, as appears below, Gallaher) knew. Forty-nine of the 101 notes were overdue when purchased. Thirty-nine were two or more months overdue. The overdue notes totaled $440,698.40. It is to be noted that Steiner testified he did not check the notes for compliance with the national banking laws before closing the purchase, but that he did check them for delinquency.

The bank did not know when it purchased the loans, but found out at a later unspecified time, that all were on Negro property. Vice-president Donahoo told all the directors about the notes. Mrs. Ingram, the only officer not a director, became aware of the situation. Donahoo refused to enter the notes on the bank's books as assets. The bank knew it had nearly a million dollars of junk loans [7] on its hands. One of the Steiner-controlled hedges was gone. It sought to avail itself of the other. Donahoo talked to Steiner:

Q. What did you say to Mr. Steiner?

A. I told him that this bank could not hold those notes, that it would apparently be the downfall of the bank, and he advised me that they were only going to be in there from fifteen to forty-five days, sort of on a warehousing deal, that they were specifically designed to go to a Federally-chartered savings and loan association in California. I urged him at that time to get those notes out of the bank.

It is noteworthy that Steiner's representation to Donahoo was different from his previous representation to Gallaher about what was intended to be done with the notes.

Gallaher went through the notes too and saw they were nonconforming. He "immediately could tell that something was wrong." Promptly he did the following:

'I got ahold of Mr. Steiner and told him he had to get them out; the bank examiners, when they came by to examine us, that they'd close us up because we had, as far as banking paper, the notes were not worth what they were supposed to be.

Gallaher began calling Steiner several times a week on the phone about getting the loans out of the bank. Each time Steiner assured him he was "working on a deal" and the notes would be out of the bank in a few days. After examining the loans himself, Gallaher set about at once to try to get a closing statement reflecting the purchase of the loans.[8]

By around October 20 the above events had occurred, and were known to some or all the officers and some or all directors (excluding consideration of Steiner, his wife and Sanfilippo). The bank was reduced to reliance on Steiner's oral promise, which proved to be worthless.

One need not consider whether in isolation the illegality and poor quality of the loans, or the approval of the loans by Steiner, or the violation by Steiner of the authorizations given him by the board and of the warnings given him by Steiner, or the failure to have the loans examined by the bank's attorneys,[9] is a determinative factor in appraising Stei-

7. When the F.D.I.C. sold the loans in June, 1964 they brought about 50 cents on the dollar.

8. This fact makes very dubious the holding that the bank had no knowledge or notice puting it on inquiry concerning the commission to Morris and Garrett. Gallaher already knew what the bank had paid for the notes. What the closing statement might reveal that he did not already know was where the money went. The best evidence that there was knowledge sufficient to trigger inquiry into the facts of the closing of the sale was that Gallaher did inquire.

9. This failure turned out to be very important, since it developed that the examination said by Steiner to have been made by a lawyer in Houston never took place.

ner's conduct. None of these exist in isolation. All are in the context of incidents of Steiner's self-dealing scheme on which the bank never should have embarked.

The obligation of a surety is not limited to losses from criminal acts such as larceny or embezzlement, but the words "personal dishonesty" have a broader meaning and may include "any acts which evinced a want of integrity and a personal breach of trust." * * * "Any illegal or unauthorized taking or withdrawal of the funds of the bank, intentionally perpetuated by the employee, whether for the benefit of himself or of another, was a wrongful conversion or abstraction and an act of personal dishonesty which constituted a breach of the bond." United States Fidelity & Guaranty Co. v. Bank of Thorsby, 46 F. 2d 950 (5th Cir. 1931), involving a cashier, who was prohibited by resolution from making loans, and, who in violation of state law, made an unsecured loan indirectly by permitting a financially irresponsible depositor to overdraw. Accord, London & Lancashire I. Co. v. People's Nat. Bank & Trust Co., 59 F.2d 149, 152 (7th Cir. 1932). See also Aetna Casualty & Surety Co. v. Austin, 285 S.W. 951 (Tex.Civ.App.1926) (surety held liable where director, indebted to his bank in the maximum amount allowed by law, procured another to obtain a loan from the bank and put the funds at the director's disposal); Fidelity & Deposit Co. v. Merchants' & Marine Bank, 169 Miss. 755, 151 So. 373 (1933) (surety held liable for president's making loan to partnership of which he was a member on note not signed by him); Guaranty Trust v. United States Fidelity & Guaranty Co., 79 N.H. 480, 112 A. 247 (1920) (surety liable for bank treasurer's paying out money on worthless notes signed by himself and relatives); National Surety Corp. v. State, 90 Ind. App. 524, 161 N.E. 832 (1928) (surety liable where cashier made loans to president exceeding a limitation established by the bank by resolution and violating a requirement that three directors approve any loan to an officer or director).

In my opinion the finding of the District Court that Gallaher was guilty of only negligence is plainly erroneous. But, pretermitting that, Gallaher's knowledge of Steiner's acts was knowledge of the bank. All the officers and directors sat silent for months, without a word to sureties or supervisory authorities, who were entitled to try to salvage the situation. Donahoo knew so much that as an experienced banker he declined to enter the loans on the bank's books as assets. The loans were assets, even if poor ones. There had to be an asset entry to balance the million dollar deposit entry. I find no explanation in the record of how the bank, from October to late March, could purport to make true financial statements. Nor do I find any logical consistency in a result that knowledge of facts which impelled an experienced banker to decline to enter the notes on the bank's books was not knowledge necessitating that the sureties be alerted.

If a surety denied liability on the ground that a total spectrum of acts such as those done by Steiner in this case were not fraudulent and dishonest, it would be almost laughed out of court. The quality of the acts is no different because they appear in the context of failure of the bank to give notice to sureties, with the consequence that the bank has cut itself off from recovery. What is dishonest and fraudulent does not depend on whether the surety or the bank is the ox being gored.

I respectfully dissent.

## ON PETITION FOR REHEARING AND PETITION FOR REHEARING EN BANC

### PER CURIAM:

The Petition for Rehearing is denied and the Court having been polled at the request of one of the members of the Court and a majority of the Circuit Judges who are in regular active service not having voted in favor of it, (Rule 35 Federal Rules of Appellate Procedure; Local Fifth Circuit Rule 12) the Petition for Rehearing En Banc is also denied.

GODBOLD, Circuit Judge:

I dissent from denial of rehearing.